IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMSARA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-084-MN |
| | ) | |
| MOTIVE TECHNOLOGIES, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

Plaintiff Samsara Inc. ("Samsara") alleges as follows in this Amended Complaint against Defendant Motive Technologies Inc. ("Motive" or "Defendant"). The allegations herein are made based on personal knowledge as to Samsara with respect to its own actions, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.    Samsara brings this action against Motive to put an end to Motive's pervasive copying and use of Samsara's proprietary technology, its false and misleading advertisements, and its unauthorized and fraudulent access to Samsara's computers and networks.

2.    For years, Motive's business plan has been simple, predictable, and endorsed by its senior management team: covertly steal Samsara's innovations and present them falsely as Motive's own. From duplicitously accessing Samsara's software under the guise of fictitious customer accounts; to copying Samsara's technology and product designs; to soliciting Samsara employees for confidential information; to lifting Samsara's mission statement, branding and marketing strategies, Motive has closely watched Samsara's patented innovations and then resorted to deceitful measures to copy them. Although Samsara has tried—for over a year—to

address Motive's conduct without resorting to litigation, Motive's leadership team not only has refused to own up to its actions, but it has used this time to continue and escalate its tactics. Its use of unscrupulous and illegal measures to build its business continues apace and, unfortunately, will not stop without judicial intervention.

3.      Motive's unlawful practices have been covert, systematic, and extensive. In one of its more brazen campaigns, its management team endorsed a policy whereby senior Motive employees created fictitious companies to procure Samsara products and access its platform. This fraudulent access of Samsara's technology dates back at least to 2018, the year before Motive launched its vehicle telematics offering, and three years before Motive released its video-based safety product. Activity records for some of the fictitious Motive-related accounts of which Samsara is aware (there may be others Samsara has not identified), show that Motive employees surreptitiously viewed the Samsara Dashboard nearly 21,000 times from 2018 to 2022, when Samsara discovered this access and disabled it. Motive's current Vice President of Product—a leadership role responsible for developing and executing the company's product roadmap and strategy—frequently used a fake account to access Samsara's platform, sometimes multiple times a week. Some of the fictitious companies Motive concocted listed addresses associated with members of Motive's senior management team, including at least one address tied to the company's CEO, Shoaib Makani. Video footage and audio captured by a Samsara device and identified during a fraud detection investigation based on Motive's conduct also confirms that Mr. Makani, Motive's Chief Product Officer, Jairam Ranganathan, and Motive's Chief Technology Officer, Siva Gurumurthy, have personally used Samsara's products and platform for improper purposes.



Footage of Motive's CEO, Shoaib Makani (left), and Chief Product Officer, Jairam Ranganathan (right), studying Samsara's products.





What is more, Motive employees have even manipulated Samsara's Customer Support team, posing as employees of real Samsara customers, to ask questions and make requests, including inquiries about the operation of certain of Samsara's AI video-based safety features, and to seek information about Samsara's third-party integrations. Samsara recognizes that competitors look at one another's products and ensure they understand their offerings. This might spur innovation and encourage robust competition. That is not what Motive has done. The surreptitious and

extensive nature of Motive's deceitful conduct went well beyond mere competitive intelligence. Indeed, Motive is aware that Samsara did not and would not grant it access to use Samsara's computers and networks in this way.  It has been carried out and sanctioned by Motive's CEO, CPO, CTO and other senior employees, and is emblematic of a corporate culture of theft and fraudulent commercial practices.

4.      When confronted about these practices, Motive did not sincerely investigate them or put an end to them.  Rather, Motive's leadership team doubled down and continued to use fictitious companies and accounts to copy Samsara's products.  It also launched a campaign to solicit Samsara employees to join Motive's workforce to acquire Samsara's confidential and proprietary information relating to current and future product plans, sales, and prospective and existing customers.  These actions are part of a years-long campaign by Mr. Makani and his leadership team to siphon off as much information about Samsara's patented products as possible. As one former "senior manager" at Motive has stated publicly, "[Motive] *relies heavily on observing competitor decision-making and duplicating those efforts.* [Motive] chooses not to study customer insights or conduct user research."[1]

5.      Motive's shameless copying reached new heights in 2022, when it rebranded from KeepTruckin to Motive and broadened its market focus to mirror Samsara's business model, operations platform, and service offerings, as well as Samsara's marketing and product-marketing strategy and materials.  This was not merely a case of a competitor adopting a fast-follow strategy to mimic an innovative market leader.  Rather, to stay afloat in the market, Motive, unable to succeed based on any real innovation of its own, has instead relied almost exclusively on copying

---

[1] https://www.glassdoor.com/Reviews/Employee-Review-Motive-RVW33088350.htm (emphasis added).

Samsara, including Samsara's patented technology.  Motive has carried out a clandestine campaign to infiltrate Samsara's platform using false customer accounts that its employees have hidden behind to study integral pieces of Samsara's products.  That this has been done secretly, through fictitious company names and accounts to avoid detection, illuminates the duplicitous intent behind the conduct.  Moreover, Motive cannot claim its imitative conduct is the work of one or more rogue low-level employees; indeed, its CEO himself is involved.

6.    Independent of Motive's improper access and copying of Samsara's technology, Motive commissioned at least two intentionally flawed and misleading benchmarking studies to "test" and "compare" Motive's product against Samsara's to gain leverage as a competitor to Samsara.  The studies' design ensured that the results would favor Motive and disfavor Samsara.  Motive now relies on the results of those studies in its advertising materials to give consumers false impressions about the efficacy and reliability of Samsara's technology, and to unlawfully compete with Samsara.

7.    Samsara was founded in 2015 by two computer science graduates of MIT, who have been recognized as technology pioneers and leading SaaS entrepreneurs.  These founders started Samsara after selling their first company, Meraki, to Cisco Systems for over $1.2 billion.  Meraki began as a single research prototype that the founders worked on together at MIT.  Their technical backgrounds and unique experience building Meraki helped them identify an opportunity to innovate for sectors of the economy like transportation and infrastructure that the wave of digital transformation had left behind.  Since Samsara's founding, the company has been a disruptor in fleet management and driver safety technology.  Samsara solves the problem of disconnected systems and operations for vehicle fleets, among other customers.  Through its advanced array of products and services—including Connected Operations$^{TM}$ Cloud technology, proprietary AI

software, and AI-enabled hardware with Internet of Things (IoT) connectivity (*e.g.*, AI dash cams)—Samsara allows customers to visualize and analyze their physical operations in real time on an integrated platform, in a way that was impossible or impractical only a few years ago. As a result of Samsara's technology, customers can enhance the safety, efficiency, and sustainability of their operations.

8.    In contrast to Samsara's revolutionary technology, Motive came to market in 2013, under the name KeepTruckin, as a provider of a simple device that recorded a commercial driver's driving time (and other hours-of-service recordkeeping), which trucking companies could use to measure compliance with U.S. regulatory mandates concerning how long truck drivers are permitted to work and drive. The functionality of this technology was hardly proprietary; similar devices have been available on the market since the 1980s to help truck drivers meet their compliance obligations.

9.    As Samsara's business sky-rocketed because of its innovative technology, Motive took notice and began covertly using Samsara's products and taking proprietary information from those products and features to produce and sell technology that directly copied Samsara's offerings. For example, two years after Samsara introduced its patented video-based safety application—an AI-powered cloud-connected dash-cam device that records footage of the road ahead as well as in the vehicle's cab—Motive launched its own imitation video-based safety solution. Since that launch, Motive has continued to update its video-based safety application with features that mimic the technology designed and implemented by Samsara in its own video-based safety solution. In addition, Motive has launched an asset tracking product, as well as a new vehicle gateway product, which syncs driver and fleet/vehicle data with analysis tools on the cloud,

both of which mirror existing Samsara products.  Motive has also announced the forthcoming release of an AI site cam, copying Samsara's Site Visibility offering.[2]

10.    As a result of Motive's unlawful and deceptive conduct, and its refusal to end that conduct voluntarily, Samsara has no choice but to file suit to redress the harm it has suffered due to Motive's intentional infringement of Samsara's intellectual property, false advertising, and other fraudulent and unlawful conduct.  As Motive's CEO has acknowledged, competition in the market is "zero sum"; every sale that Motive makes at Samsara's expense causes Samsara not only to lose revenue, but also to suffer irreparable harm, as that customer will not make another purchase for at least the length of its contract with Motive (approximately four years), and likely longer given the costs associated with switching suppliers.  *Infra* ¶ 99.  In addition, Motive's false promotion of its inferior products irreparably harms Samsara's brand reputation and goodwill by diminishing the value of the Connected Operations[TM] Cloud platform and technology that Samsara offers.  Samsara thus brings this complaint to redress Motive's flagrant false advertising, fraud, violations of federal hacking law, and infringement of Samsara's patents.

## THE PARTIES

11.    Samsara is a Delaware corporation, with its headquarters and principal place of business located at: 1 De Haro Street, San Francisco, CA 94107.

12.    Motive is a Delaware corporation, with its headquarters and principal place of business located at: 55 Hawthorne Street, Suite 400, San Francisco, CA 94105.

---

[2] https://www.mckinsey.com/industries/travel-logistics-and-infrastructure/our-insights/logistics-disruptors-motives-shoaib-makani-on-ai-and-automation.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

14.    This Court has personal jurisdiction over Motive because Motive is incorporated in Delaware.

15.    Personal jurisdiction also exists over Motive under Delaware's long-arm statute, Del. Code. Ann. Tit. 10, § 3104, because Motive (i) has committed acts of infringement in this District; (ii) advertises, markets, offers for sale, imports, stores, distributes, and/or sells infringing products in this District; and (iii) has caused tortious injury in the state by an act or omission in the state, from which Samsara's causes of action arise.

16.    Venue is proper in this District, pursuant to 28 U.S.C. § 1400(b), because Motive resides in Delaware as it is incorporated in this state.

## SAMSARA PIONEERED THE FIELD OF IOT DATA-DRIVEN OPERATIONS

17.    Samsara is a pioneer and leader in the field of data-driven operations powered by IoT device connectivity.  Founded in 2015, Samsara has been on a mission to increase the safety, efficiency and sustainability of physical operations that power the global economy.   Its groundbreaking platform, the Connected Operations™ Cloud, is a cloud-based solution that allows customers with physical operations in broad-based industries to obtain information about their devices, equipment, and operations using IoT devices, and to manage and analyze this information with advanced AI tools, allowing them to operate more safely, efficiently, and sustainably—in a word, more intelligently.

18.    Samsara was founded by Sanjit Biswas and John Bicket.  The two met as graduate students at the Computer Science and Artificial Intelligence Laboratory at the Massachusetts

Institute of Technology ("MIT").  In 2006, they co-founded Meraki, a cloud-managed networking company that was later acquired by Cisco Systems in December 2012 for $1.2 billion in cash.[3]

19.    Mr. Biswas, currently serving as Samsara's Chief Executive Officer, has been recognized as an MIT Technology Review "Innovator Under 35" honoree, a Technology Pioneer by the World Economic Forum, Glassdoor's 2018 Top CEO, one of Goldman Sachs 100 Most Intriguing Entrepreneurs, and one of The Software Report's top 50 SaaS CEOs.  He holds a B.S. in Computer Systems Engineering from Stanford and an S.M. in Electrical Engineering and Computer Science from MIT.

20.    Mr. Bicket, who currently serves as Samsara's Chief Technology Officer, is responsible for Samsara's disruptive technology that makes operating thousands of sensors simple and secure.  He holds a B.S. in Computer Science and an S.M. in Computer Science from MIT. He co-founded Meraki based on his MIT research, building integrated hardware, software, and cloud-based infrastructure that powered over 100% annual sales growth.  Meraki's platform scaled to connect millions of network devices across 140 countries.  After Cisco acquired Meraki, Mr. Bicket served as Vice President of Engineering in Cisco's Cloud Networking Group and led Meraki as Cisco's fastest-growing cloud product.

21.    Messrs. Biswas and Bicket formed Samsara to create integrated IoT solutions that bring the benefits of data to the operations that power our economy.  Since its founding, Samsara's growth, propelled by its groundbreaking research and development, intense focus on customer feedback, and the hard work of its employees, has been meteoric.  Within three years of its founding, it reached "unicorn" status—a start-up with a valuation of over $1 billion.  In December

---

[3] https://techcrunch.com/2012/11/18/cisco-acquires-enterprise-wi-fi-startup-meraki-for-1-2-billion-in-cash/.

2020, just five years after its founding, Samsara reached 20,000 customers, one million connected devices, and a valuation of $5.4 billion.[4]  Between 2018 to 2021, Samsara's revenue grew 2,828%, as it continued its trajectory of substantial growth at scale, earning it a spot on the respected Deloitte Technology Fast 500™ for three consecutive years.[5]

22.    In 2021, *Financial Times* ranked Samsara as the second-fasted growing company in America,[6] and in November of that year, Samsara filed for an initial public offering of its shares at the New York Stock Exchange.  The IPO took place in December 2021 at a valuation of approximately $12 billion.  By late 2022, Samsara surpassed 1,600 employees worldwide and became the largest open ecosystem for physical operations with more than 200 integration partners on the Samsara platform.[7]  Samsara's strong commitment to innovation earned it a spot on *Fast Company*'s 2023 Best Workplaces for Innovators list, which honors "organizations and businesses that demonstrate an inspiring commitment to encourage and develop innovation at all levels."[8]

23.    Presently, Samsara serves tens of thousands of customers across a wide range of industries, including transportation, wholesale and retail trade, construction, field services, logistics, utilities and energy, government, healthcare and education, manufacturing, and food and beverage.  Businesses in these industries operate critical infrastructure and are the foundation of the global economy.  They operate high-value assets, coordinate large field workforces, manage

---

[4] https://www.prnewswire.com/news-releases/samsara-reaches-20-000-customers-and-1-million-connected-devices-301195338.html?tc=eml_cleartime.

[5] https://www.businesswire.com/news/home/20221116005821/en/Samsara-Recognized-as-one-of-North-Americas-Fastest-Growing-Companies-on-the-2022-Deloitte-Technology-Fast-500%E2%84%A2.

[6] https://www.prnewswire.com/news-releases/samsara-named-2-on-financial-times-list-of-fastest-growing-companies-in-the-americas-301267963.html.

[7] *Id.*; https://www.businesswire.com/news/home/20220913005304/en/Samsara-Announces-200th-Partner-Integration-with-its-Connected-Operations-Cloud-Becoming-System-of-Record-for-Physical-Operations.

[8] https://www.samsara.com/blog/samsara-recognized-as-a-best-workplace-for-innovators.

complex logistics and distributed sites, and face environmental, safety and other regulatory requirements.  Historically, these businesses relied on error-prone, deficient, inefficient, and manual processes and legacy systems that were siloed and lacked cloud connectivity as well as computational and operational capability to obtain real-time and actionable information and analysis.  Without connected digital tools, and innovative improvements to the operation of such tools, physical-operations businesses struggled to access real-time data, making it nearly impossible to achieve complete operational visibility or drive meaningful improvements in productivity.

## SAMSARA'S GROUNDBREAKING SOLUTIONS FOR IOT DATA-DRIVEN OPERATIONS

24.     Samsara began its journey by creating innovative digital solutions for the physical operations of connected fleets. Commercial vehicle fleets are the backbone of many physical operations and are required to deliver and transport services, goods, and people in virtually all industries.  Businesses with commercial vehicle fleets face continued pressure to reduce costs and improve services, while simultaneously finding ways to overcome high accident rates, inefficient fuel consumption, and compliance burdens.

25.     Samsara discovered substantial problems in the industry associated with the inability to effectively and accurately obtain real-time updates and actionable information while vehicles were in transit.  One of its initial products was a vehicle telematics solution, supported by the Vehicle Gateway.  This hardware device connects directly to a vehicle's engine to read vehicle diagnostic information, track GPS location, and support temperature monitoring.  It also connects wirelessly to the cloud, feeding vehicle information to the Samsara Dashboard, a customer-facing online portal where a customer can see data for assets across their organization all in one place.

This product gave customers operational visibility and actionable data insights to drive meaningful improvements in their vehicle fleets like never before.

26.    Unlike other existing telematics solutions, Samsara's product offered customers a single integrated platform that brought together data from across an organization's physical operations.  The quality and quantity of the data types on Samsara's platform, and Samsara's innovations in the technologies used to obtain, analyze, and report that data, also increased the value of the solution, offering customers more precise, analytic insights that only improved as Samsara continued to analyze more data.  This product was also built to fully integrate with third-party applications, such as enterprise resource planning, payroll, and human capital management applications, extending the impact of the data collected by the Samsara devices to a customer's existing applications.  Samsara's solution was also easy to install and use, enabling customers of all sizes and levels of sophistication to deploy it.  These and other differentiating factors set Samsara apart and allowed it to grow quickly.

27.    In 2017, Samsara introduced a webcam—the CM11, shown below—that connected to the USB port of the Vehicle Gateway.[9]  The CM11 was a groundbreaking Internet-connected dash cam developed based on customers' need to instantly flag and upload for a fleet manager's review footage of harsh driving events (*e.g.*, harsh turns, accelerations, or stops).  Unlike other in-vehicle cameras that required manual downloads and time-consuming reviews, Samsara's CM11 and Vehicle Gateway system detected these harsh events and allowed organizations to quickly access footage showing what happened in the time leading up to and immediately following a crash or near-miss event.  The CM11 also integrated with Samsara's Safety Reports feature, which aggregates data from the Vehicle Gateway to help fleet managers see how their drivers are

---

[9] https://www.samsara.com/ca/blog/improve-fleet-safety-with-samsara/.

performing, allowing them to identify unsafe driving, incentivize good behavior, and give effective feedback. The Safety Report, paired with footage captured by the CM11, helped customers see footage relevant to their drivers' performance and effectively coach drivers on safe driving behavior, resulting in lower operating costs while improving fleet safety.

28.    After releasing the CM11 in Spring 2017, Samsara continued to build on the product's success by updating it based on customer feedback. In December 2017, Samsara introduced the CM22, a dash cam also having an inward-facing camera, as shown below. With this product, fleet managers could better analyze driver behavior and coach their drivers on unsafe driving habits to help improve road safety and avoid accidents altogether.

                      

CM11 Dash Cam                          CM22 Dash Cam

29.    As Samsara continued to iterate on its technology, AI increasingly became a key part of the company's product offering. Samsara's IoT sensors generate and collect raw data in the form of millions of hours of dash cam video and trillions of vehicle-related data points. Samsara leveraged this data to build innovative and advanced AI models. In February 2019, Samsara also introduced the CM31 and CM32 dash cams, which ran state-of-the-art AI algorithms onboard the cameras able to automatically detect unsafe driving behaviors.



Dash Cam Detecting Unsafe Driving Behavior[10]

30.    Today, Samsara's technology offers an end-to-end solution, connecting physical operations data from IoT devices to its Connected Operations™ Cloud.  The Connected Operations™ Cloud consists of Samsara's Data Platform and Applications, as shown below.  The Data Platform ingests, aggregates, and enriches data both from Samsara's IoT devices and a growing ecosystem of connected assets and third-party systems, and makes the data available for use by the Applications.  The Applications provide analyses that customers can use to make their operations safer and more efficient.

---

[10] https://www.samsara.com/products/safety/dash-cam.



Samsara Connected Operations™ Cloud[11]

31.     For physical devices or equipment that are offline, Samsara offers IoT devices that capture data and connect them to the cloud.  For physical assets already embedded with cloud connectivity, Samsara partners with original equipment manufacturers ("OEMs") to receive data via application programming interfaces ("APIs").  Data may also be captured from customer enterprise applications or local software systems.  The collected data is ingested into Samsara's Data Platform, as shown below, where it is aggregated, enriched, and analyzed using embedded

---

[11] https://www.samsara.com/products/platform/#impact0.

functionality for AI, workflows and analytics, alerts, API connections, and data security and privacy.



Samsara Cloud Connectivity[12]

32.     The Samsara Data Platform powers Samsara's Applications, which include solutions for Video-Based Safety, Vehicle Telematics, Apps and Driver Workflows, Equipment Monitoring, and Site Visibility.

33.     Samsara's Applications include:

● *Video-Based Safety*:  Enables customers to build a safety program and protect their teams with AI-enabled video. Key functionalities include: detecting high-risk behaviors and incidents for real-time coaching alerts; preserving video records to exonerate drivers and dispute fraudulent damage claims; and providing software coaching workflows to analyze and improve driver safety.

● *Vehicle Telematics*:  Provides a robust, real-time telematics solution with GPS tracking, routing and dispatch, fuel efficiency management, electric vehicle usage and charge planning, preventative maintenance, and diagnostics capabilities to efficiently manage vehicle fleets in a sustainable way.

● *Apps and Driver Workflows*:  Improves driver productivity and enables regulatory compliance, as drivers see upcoming jobs, capture electronic documents, perform maintenance inspections, maintain compliance logs, and message with back-office

---

[12] https://www.fleeteurope.com/en/connected/europe/features/samsara-vehicle-telematics-fleet-technology-goes-beyond-gps-tracking?t%5B0%5D=Samsara&t%5B1%5D=Telematics&t%5B2%5D=Connectivity&curl=1.

administration. The apps allow users to digitize documents, exchange key real-time messages, and manage driver workflows.

34.    In addition to the Connected Operations™ Cloud, Samsara offers, among other things, hardware and accessories for Video-Based Safety, Vehicle Telematics, Equipment Monitoring, and other applications. These hardware products are part of a complete hardware and software solution to enhance efficiency, safety, customer service, and compliance.

35.    **AI Video-Based Safety:** Samsara's Video-Based Safety hardware includes the Dual-Facing AI Dash Cam (*i.e.*, both driver-facing and road-facing) and Front-Facing AI Dash Cam. These cameras upload HD video footage to the Samsara Cloud. They also perform real-time analysis onboard and include built-in speakers for driver alerting to reduce and correct for high-risk behaviors, such as distracted driving and tailgating. With these video-based safety solutions, operators can improve fleet safety, lower their operating costs, and gain deep visibility into their fleet operations.





CM32 Dual-Facing AI Dash Cam                    CM31 Front-Facing AI Dash Cam

36.    The Samsara AI dash cams provide front-facing video, and the dual-facing model provides driver-facing video as well. The videos allow operators to capture and retrieve high-definition ("HD") video of critical events (such as collisions, near-misses, distracted driving, as shown below), with HD footage uploaded to the cloud and tagged with behaviors within minutes of an event occurring.





37.     Samsara has researched and developed, and offers, advanced AI tools that use dash cam video footage to improve driver safety.  The suite of AI features includes detection of unsafe driving behaviors, *e.g.*, tailgating, rolling stop detection, driving without a seatbelt, and mobile phone usage, in addition to provision of in-cab alerts to the driver to help them recognize and correct risky behavior in real time.  By detecting these unsafe driving behaviors, Samsara's platform can also calculate safety scores for drivers, enabling both customers and drivers to measure and track driving behavior over time.  This gives customers visibility into how driver behavior is trending, both individually and in relation to other drivers in the fleet.  This data also helps fleet managers understand how to appropriately coach drivers to help reduce crashes, protect valuable equipment, realize lower insurance payouts and premiums, and improve driver and road safety.





38.    **Vehicle Telematics:**  For vehicle telematics, Samsara offers the Vehicle Gateway, an advanced-sensor platform for fleets that provides operators with real-time location and analytics, sensor data, accessory compatibility, Wi-Fi hotspot connectivity, and hours of service logging.  The vehicle telematics application, supported by the Vehicle Gateway hardware, shown below, offers an extensible platform that works with Samsara wireless sensors, camera modules, Samsara USB accessories, and Wi-Fi devices.



HW-VG-54-NA
Vehicle Gateway



HW-VG54-NAH
Vehicle Gateway



VG34
Vehicle Gateway

39.    As an important part of Samsara's research and development activities, inventors working for Samsara have been granted over 100 U.S. patents, with over 100 applications currently pending.

## MOTIVE COPIED SAMSARA'S TECHNOLOGY

40.    Motive was founded as KeepTruckin in 2013 by Shoaib Makani, Ryan Johns, and Obaid Khan. KeepTruckin was founded with a narrow focus and without any real technological

innovation: It began by offering an electronic logbook app for truck drivers to record their hours of service,[13] as well as electronic logging devices ("ELDs") for trucking companies that sought to meet U.S. regulatory mandates around how long truck drivers could work and drive. On information and belief, the KeepTruckin ELD connected to the truck driver's smartphone app, creating a digital log of hours worked that could not be altered. Even at KeepTruckin's founding, an ELD was a well-known device for automatically recording a driver's driving time and other aspects of the hours-of-service ("HOS") recordkeeping.[14] ELDs go back at least to the 1980's.[15]



KeepTruckin's first offering in 2013.

41.    KeepTruckin initially focused on digital freight brokerage.[16,17] But despite raising venture capital funds, by its own CEO's admission it had a "middling" growth trajectory and faced

---

[13] https://web.archive.org/web/20131213071205/https://keeptruckin.com/.

[14] https://www.fmcsa.dot.gov/hours-service/elds/eld-fact-sheet-english-version.

[15] https://gpstrackit.com/blog/a-timeline-of-the-eld-mandate-history-and-important-dates/.

[16]
https://www.supplychain247.com/article/keeptruckin_raises_18_million_as_silicon_valley_eyes
_trucking_industry/CSA.

[17] *CEO Motive, Shoaib Makani w/ special guest Illya Fushman: Powering the Physical Economy*, Grit Podcast (available at:

existential moments during which it almost ran out of money.[18]  Starting in 2018, KeepTruckin

began to realize that its bet on digital freight brokerage was a mistake, and by late 2019 sought to

exit that business altogether[19] and re-orient towards developing systems for connecting physical

operations and developing AI tools to automate workflows—the same market that Samsara had

pioneered years earlier.

42.    Motive did not enter that market as a pioneer or an innovator, but as a follower and

a consummate copyist.  The history of KeepTruckin's products highlights this practice: well after

Samsara had introduced its video-based safety application, in June 2018 KeepTruckin released its

imitation product, the Smart Dashcam.[20]  Mimicking the Samsara dual-facing dash cam,

KeepTruckin's copy had a road-facing camera and a driver-facing camera, and relied on the

assistance of an "[i]n-house safety team" to detect high-risk events, including harsh driving events,

stop sign violations, and passing violations.[21]  In August 2021, KeepTruckin introduced its AI

Dashcam.[22]  That AI Dashcam, like the Samsara AI dash camera released years earlier, includes

an AI processor and computer vision algorithms that can detect unsafe driving and alert drivers in

real time.[23]

---

https://podcasts.apple.com/us/podcast/grit/id1510985491?i=1000613035204) ("Grit Podcast") at
37:20–50; 38:56–39:00.
[18] *Id.* at 18:40–53; 27:30–27:44.
[19] *Id.* at 37:50–38:38; 41:31–41:43.
[20] https://www.facebook.com/keeptruckin/videos/keeptrucking-smart-
dashcam/10212841352048331/; https://gomotive.com/blog/announcing-smart-dashcam/;
https://gomotive.com/content-library/spec-sheet/smart-dashcam/.
[21] https://gomotive.com/blog/announcing-smart-dashcam/; https://gomotive.com/wp-
content/uploads/2023/03/smart_dashcam_spec_sheet.pdf.
[22] https://www.businesswire.com/news/home/20210812005612/en/KeepTruckin-Launches-New-
AI-Dashcam-Featuring-Industry-Leading-Accuracy-to-Proactively-Prevent-Accidents-Increase-
Safety-and-Efficiency.
[23] https://gomotive.com/content-library/spec-sheet/ai-dashcam/.



Samsara's CM32 Dash Camera                    Motive's AI Dashcam

43.     KeepTruckin also copied Samsara with respect to its vehicle telematics product. Several years after Samsara had introduced its vehicle telematics application, Motive followed with its imitation product, even lifting the name of Samsara's Vehicle Gateway hardware device.

                    

Samsara Vehicle Gateway[24] (released 2016)    Motive Vehicle Gateway[25] (released 2019)

44.     More recently, on information and belief, KeepTruckin has continued to copy Samsara to offer products relevant to the market and stay afloat. In 2022, KeepTruckin rebranded itself as Motive to leave behind its roots as an electronic logging device and freight brokerage company.[26] Alongside the rebrand, Motive launched the Automated Operations Platform,[27] which, on information and belief, was modeled on Samsara's Connected Operations™ Cloud. Like Samsara's pioneering cloud product, Motive's copycat platform collects and analyzes fleet data from hardware sensors. Motive advertises its "integrated platform" as having three main layers: (i) the Motive IoT devices that collect data from the fleet (the Vehicle Gateway; the AI

---

[24] https://www.samsara.com/pdf/VG34-VG54-DataSheet.pdf.
[25] https://gomotive.com/content-library/spec-sheet/vehicle-gateway/.
[26] https://www.businesswire.com/news/home/20220412005423/en.
[27] *Id.*

Dashcam and Omnicam; the Asset Gateway; and the Environmental Sensor); (ii) Motive Data Platform; and (iii) Motive AI-Powered Applications, as depicted below.[28]  On information and belief, this structure mimics that of Samsara's Connected Operations™ Cloud, which is also based on three layers: (i) IoT devices; (ii) Samsara Data Platform; and (iii) Samsara Applications:





45.    Motive is copying Samsara's patented technology at all levels:  the overall structure of its system, the AI-Powered Applications it offers to analyze customer data, the look and feel of the user interface for its telematics and safety solutions, and the IoT hardware devices (*e.g.*, Vehicle Gateway and AI dash cams) that collect the necessary data and enable all follow-on services.

46.    Even after its rebrand and shift in focus, Motive has yet to become profitable—as its CEO said when he laid off six percent of the workforce, Motive was, at best, "on the path to profitability"[29]—a path originally plowed by Samsara.

## MOTIVE FRAUDULENTLY ACCESSED SAMSARA'S TECHNOLOGY

47.    On information and belief, Motive has engaged in a fraudulent scheme to access and copy Samsara's technology and marketing strategy since at least 2017.  This scheme accelerated after Samsara's successful IPO in 2021, when Motive decided to rebrand itself in the image of Samsara as an IoT automation company.

48.    Motive's scheme involved numerous Motive personnel—using fictitious names and companies as cover—extracting information about Samsara's products and services by accessing Samsara's platform, obtaining Samsara hardware, and contacting Samsara's customer service representatives.  On information and belief, Motive took such efforts under false pretenses to copy Samsara's products and business plan, as well as to learn information about Samsara's technology that Motive used to design flawed benchmarking studies that would give consumers the false impression that Motive's products outperform Samsara's.

49.    Samsara's platform is built for, and is only accessible to, its technology partners and customers (and the Samsara employees serving them).  If Samsara knew that an account had been created on Samsara's platform for a company to use in competition with Samsara, Samsara would reject the account, and it certainly never agreed to allow Motive to access its platform to copy Samsara's market-leading technology.  To circumvent this problem and to conceal its extensive examination of Samsara's technology, on information and belief, Motive created Samsara accounts for fictitious companies disguised as legitimate or potential customers of

---

[29] https://gomotive.com/blog/shoaib-makanis-message-to-employees/.

Samsara.  Many users of these accounts—all of which, on information and belief, are or were affiliated with Motive—also used fictitious names to hide their true identities.  Motive employees and affiliates provided this false information to Samsara to deceive it into allowing Motive to access Samsara's platform, as well as provide Motive with other benefits available only to Samsara customers (such as the ability to purchase Samsara's products from Samsara's online store or a Samsara sales representative and to receive support from Samsara's customer service team).

50.    Samsara relied on Motive's false representations about the fictitious companies to which the accounts belonged, as well as the fake identities and corporate affiliations of the users, and granted the accounts access to Samsara's platform, fulfilled orders for Samsara products placed on through Samsara's online store or a Samsara's sales representative, and answered questions submitted to Samsara's customer service team.  In doing so, Samsara unknowingly provided Motive with non-public information regarding the capabilities and integrations of Samsara's products.

51.    Because Motive actively concealed facts about the true identities of its employees and their corporate affiliations, Samsara was unaware of the falsity of Motive's representations until 2022.

52.    By way of example, an individual who went by the name Abhishek Gulati, but is believed to be Mr. Abhishek Gupta, Motive's Vice President of Product,[30] ordered Samsara devices and, on October 6, 2019, created an account on the Samsara Dashboard using the fictitious company name, Monstera Transport.  For over two and a half years—between October 2019 and

---

[30] On information and belief, Mr. Gupta was promoted to Vice President of Product after Samsara notified Motive of his extensive involvement in Motive's improper conduct. Rewarding Mr. Gupta with a promotion, despite his wrongdoing, further evinces Motive's endorsement and encouragement of unlawful activity.

June 2022—Abhishek Gupta used the Monstera Transport account, as well as other user accounts, to regularly access Samsara's dashboard. On information and belief, Mr. Gupta used other fake names, such as Abhi Gonzalez and Tim Duncan, as driver names and usernames to access the Monstera Transport account.

53.    In addition, on information and belief, multiple other Motive employees—including two Senior Product Managers and one Head of Product—activated at least a dozen Samsara devices purchased through a Motive customer (referred to herein as "Company A") on the Monstera Transport account. These devices include, but are not limited to, Samsara's Vehicle Gateway (VG34), AI Dash Cam (CM31 and CM32), environmental monitor (EM21)[31] and the asset gateways (AG45).[32] They uploaded a United States Space Force logo to their account and added Motive employees as account users. Activity records show that Motive employees regularly accessed the Samsara Dashboard, viewing it thousands of times as of September 2022, sometimes hundreds of times a day, multiple times per week. There were multiple days where Motive personnel viewed the Samsara Dashboard hundreds of times, with one day peaking at over 350 Samsara Dashboard views. Based on information and belief, known locations of several devices associated with this account are Motive offices in San Francisco, California and Buffalo, New York, as well as personal addresses of former and current Motive employees.

---

[31] https://www.samsara.com/uk/products/models/em21/.
[32] https://www.samsara.com/pdf/docs/AG45_Datasheet.pdf.



54.     On information and belief, users of the Monstera Transport account contacted Samsara's Customer Support team with questions and requests about its sham use of Samsara's products and services.  On October 7, 2019, a user posing as a Monstera Transport employee, but believed to be Abishek Gupta, requested that Samsara "enable the AI features [on the dual facing dash cam] such as tailgating, distracted driving and mobile use."  That same day, this account viewed the Samsara Dashboard nearly 220 times.  That same user, on April 20, 2020, asked "[h]ow is my driver supposed to approve an edit I made back to his log in November 2019? I can't figure out how to show them in the mobile app[,]" and, on March 15, 2022, asked "[h]ow do I add the JD link Integration to my samsara account?  I am also interested in the CAT visionlink integration."  In addition, on March 15, 2022, a different user of the Monstera Transport account, believed to be Motive's Senior Product Manager, Sean Santschi, submitted a ticket to Samsara customer support asking "[h]ow do [I] get JDlink (John Deere) and Visionlink (Catepillar [*sic*]) integration connected to our fleet account?"  Relying on these users' representations regarding their

employment affiliation, Samsara representatives replied to each of the requests, divulging information about Samsara's proprietary products and services.

55.    On information and belief, this scheme to access and obtain Samsara product information has been carried out and sanctioned by multiple senior-level Motive employees, including members of its executive team—the CEO, the Chief Product Officer, the Chief Technology Officer, the Vice President of Product, the Head of Product Operations, two Directors of Product Management, and several Senior Product Managers.  The fictitious Monstera Transport account, alone, is associated with at least the following 15 Motive employees, as well as one consultant retained by Motive.  On information and belief, all employees listed below with an asterisk by their names have received promotions since Samsara notified Motive of their involvement in Motive's unlawful activity.

| Title | Employee Name | Name(s) Used in Dashboard Profile | Account Creation Date |
|---|---|---|---|
| Vice President of Product | Abhishek Gupta* | Abhi Gonzales<br>Abhi Gupta<br>Abhisehk Gupta<br>Tim Duncan | 2020-12-04<br>2019-10-06<br>2019-10-07<br>2021-07-28 |
| Head of Product, Enterprise Platform | Sean Santschi* | Tyler | 2020-03-15 |
| Senior Product Manager | Cindy Xiuyi Li* | Cindy Li<br>Cindy<br>cindy 2<br>Cindy Exempt<br>Cindy Test | 2021-05-11<br>2020-08-14<br>2020-12-01<br>2020-11-18<br>2020-08-24 |
| Head of Product, Compliance, Mobile Apps, and New Product | Jason Pesek | Jason | 2020-08-22<br>2019-11-14 |
| Senior Director of Product Management | Prateek Bansal* | Prat Bnl | 2021-05-28 |

| Title | Employee Name | Name(s) Used in Dashboard Profile | Account Creation Date |
|---|---|---|---|
| Staff Product Manager, Safety | Mary Shepherd | Pratesh Pravan | 2019-10-08 |
| Manager, Sales Engineering | Denise Grove | DJ | 2020-11-17 |
| Product Manager (former) | Breanna Culleney | Brenana Exempt Bre | N/A[33] |
| Group Product Manager – Motive Card | Dhruvi Vora Singh* | Dhruvi Dhruvitest2 | 2021-03-01 2021-07-12 |
| Director of Product Management | Ankur Nandu | Ankur | 2020-02-25 |
| Head of Product, Asset Management (former) | Seth Spiel | Seth Spiel | N/A[34] |
| Product Manager | Aqsa Masood | Aqsa Masood | 2022-03-14 |
| Consultant/Agent | Laurens Delpech | Laurens Delpech | 2019-11-18 |
| Chief Product Officer | Jairam Ranganathan | Captain Jay | 2019-10-09 |
| Product Manager, Dispatch & Tracking (former) | Brett Musco | Brett L M | 2022-06-09 |
| Chief Executive Officer | Shoaib Makani | Unknown | Unknown |
| Chief Technology Officer | Siva Gurumurthy | Unknown | Unknown |

[33] On information and belief, Breanna Culleney's personal phone number is listed as account "alert contact."

[34] On information and belief, Seth Spiel's personal address is listed on the account, including as the account shipping contact.

56.    Motive's impermissible access to this account only stopped after Samsara discovered the improper conduct and disabled the account on or around June 8, 2022.  Motive's use of the Samsara platform was frequent up until access was disabled, with Dashboard views from April 1, 2022 to early June 2022 exceeding 1,800.

57.    Motive employees have also accessed at least two other accounts, under fictitious company names, as a part of its systematic infiltration and misuse of Samsara's information.  The first is Northside Salvage Yard Inc., which was used to create an account on October 27, 2017 that has been associated with two residential addresses believed to be linked to Motive's CEO, Shoaib Makani.  One of these two addresses was entered in the Samsara Dashboard for the Northside Salvage Yard account in February 2018 under the title "Home Base."  The second address was entered in December 2018 as "Home Address."  Video footage captured by a Samsara device confirms that Mr. Makani has personally used Samsara's products and platform under false pretenses.  *Supra* ¶ 3.  The other users of the account are believed to be associated with Motive's former Product Manager, Anthony Guay and former Head of Product, Asset Management, Seth Spiel.  In addition to having its own Samsara Dashboard with at least two devices, the Northside Salvage Yards account was also used to order one of the devices, Samsara's cargo monitor,[35] activated on the Monstera Transport dashboard.  On information and belief, Motive has also shared access to this account with at least one third party.

58.    The second is the company CMS Transportes, which was also used to create a Samsara account associated with Motive's Head of Product Operations, Rebeca Soto Healy on February 11, 2020.  Ms. Healy used the names Carlos Soto and Esteban Martinez and at least three Samsara devices in connection with the account.

---

[35] https://www.samsara.com/products/models/cargo-monitor.

59.     On information and belief, Motive employees accessed Samsara's platform with the specific intent to copy Samsara's competitive technology, platform features, and overall business and marketing strategy.  On information and belief, the information that Motive gathered as a result of its pervasive, unlawful access was not publicly available to non-Samsara account holders and was also used by Motive to inform the commission and design of flawed benchmarking studies, as explained in more detail below.  Tellingly, Motive's continuous and systematic access of Samsara's platform under false pretenses, and with knowledge and approval of Motive executives and senior employees, reflects Motive's knowledge that it was acting unlawfully and unfairly to misuse Samsara's products, reverse engineer them, and rebrand the technology as its own, all to leverage the fruits of Samsara's extensive research and development efforts.

60.     On information and belief, Motive used the information obtained by its fraudulent access to copy Samsara's technology and marketing strategy.  For example, following its rebrand, Motive publicized a new tagline, "Connect your fleet. Automate your operations."  On information and belief, this tagline was based on Samsara's long-existing and well-known tagline, "Connect Your Operations," as shown below.




Samsara Tagline                              Motive Tagline

61.    As another example, after its April 2022 rebrand, Motive also publicized a new

mission statement ("*To transform the safety, productivity, and profitability of businesses and*

*organizations that power the physical economy*") that, on information and belief, was based on

and paraphrases Samsara's long-standing mission statement ("*To increase the safety, efficiency,*

*and sustainability of the operations that power the global economy*").  After Samsara pointed out

that Motive's statement copies Samsara's, Motive altered its mission statement.  Motive's CEO,

however, continues to use similar statements to describe Motive's mission, such as "Motive builds

technology to improve the safety, productivity, and profitability of businesses that power the

physical economy."[36]

62.    Motive even used the information it obtained to mimic Samsara's business premise.

For example, in April 2022, Motive's CEO parroted Samsara's talking points from its March 2,

2022 shareholder letter about the need to meet the demands of physical operations businesses.

---

[36] https://www.mckinsey.com/industries/travel-logistics-and-infrastructure/our-insights/logistics-disruptors-motives-shoaib-makani-on-ai-and-automation.



63.    Motive's own employees have explicitly acknowledged Motive's strategy of copying competitors, rather than investing in its own research and technology development.  In a GlassDoor post, a former Motive Senior Manager addressed this directly, as shown below:



64.    Indeed, Motive's copying even targeted Samsara's publications and blog posts.  For example, after Samsara published "9 Tips for Getting Buy-in on Dash Cams," Motive followed with its own "7-step guide to getting driver buy-in on dashcams" that mimicked many of Samsara's tips.



65.    After discovering the nature and extent of Motive's conduct, Samsara disabled the accounts associated with Motive employees to prevent further unauthorized access.  In June 2022, Samsara also sent a letter to Motive's Board of Directors informing them of Motive personnel's improper use of Samsara's products and Dashboard.  Samsara requested that Motive provide a list of all accounts that its employees, directors, and agents used to access Samsara's platform, as well as written verifications that all information gathered through Motive's fraudulent practices has been returned and that the unlawful conduct has stopped.  Despite Samsara renewing that request, including as recently as September 2023, Motive has steadfastly refused to provide the requested verifications.

66.    Rather, Motive represented only that it "asked its employees not to access Samsara's platform while the parties try to resolve this dispute."  If that request was in fact made, however, Motive employees did not comply.  For example, one of the email addresses associated with the Monstera Transport account (and belonging to Motive's Vice President of Product, Mr. Gupta) was used to create a new account under the fictitious company name "Org." on July 6, 2022, as well as a user account under the name Abhi Gupta.  Between July 15 and August 11, 2022

(when Samsara disabled that account as well), this fictitious company viewed Samsara's Dashboard over fifty (50) times.

67.     The totality of Motive's conduct, viewed against the backdrop of its previous attempts to improperly access Samsara's platform, its rebrand and reorganization of its website and dashboard, its copying of Samsara's proprietary technology, and its release and promotion of misleading reports by Strategy Analytics and VTTI (described below), is indicative of a pervasive culture of copying and unlawfully competing at Motive.   Motive's conduct has also injured Samsara through, among other things, the loss of competitive information, as well as the expenditure of substantial time and resources of employees who conducted internal investigations regarding the existence of fictitious accounts, the Motive personnel associated with those accounts, and the extent of Motive's unauthorized access to Samsara's platform and technology via these accounts.

## MOTIVE MADE FALSE AND/OR MISLEADING STATEMENTS ABOUT SAMSARA'S TECHNOLOGY

68.     Motive has also sought to unlawfully compete with Samsara through advertisements that contain false claims about the functionality and efficacy of Samsara's AI video-based safety applications.

69.     Samsara's AI video-based safety application revolutionized the industry.   In combination with its Connected Operations$^{TM}$ Cloud and the vehicle telematics application, Samsara's AI video-based safety solution has helped reduce accidents, exonerate drivers when they were not at fault for an accident, lower insurance costs, lower vehicle wear and tear, and increase driver retention.

70.     Motive has now commissioned at least two flawed studies about Samsara's successful AI video-based safety application.   The first was in 2022, when Motive engaged the

research firm Strategy Analytics to conduct a purported comparative study of the Samsara HW-CM32, Lytx Drive Cam SF300, and Motive DC-54 dash cams that was, on information and belief, corrupt from the start. The Director of Projects, UX Innovation Practice at Strategy Analytics, Mr. Paul Brown, purchased the Samsara dash cam via a fake company name, S.D. Logistics, using his personal email address, and, on information and belief, shared the Samsara account that was used for the study with a Motive employee, thereby compromising the integrity of the data collected during the study and the analysis thereof.

71. On April 15, 2022, Strategy Analytics published a report, excerpted below, authored by Mr. Brown and Ms. Monica Wong, of its evaluation of the cameras, which stated that the study was conducted "on behalf of Motive." Ex. 4 (AI Dash Cam Benchmarking) at 2. The report contained several false claims about the reliability and accuracy of Samsara's AI video-based safety application and, on information and belief, was based on a flawed methodology.

## INTRODUCTION 

- AI dash cams help prevent accidents by reducing distracted driving and other risky road behaviors. The cameras are mounted on the windshield and use artificial intelligence to detect unsafe driving behaviors and road conditions. Once detected, the cameras notify drivers with in-cab audio and visual alerts to help drivers modify their behaviors.

- Strategy Analytics undertook an independent evaluation of three leading AI dash cam providers (Motive, Lytx, and Samsara) on behalf of Motive. Strategy Analytics benchmarked performance across the following four criteria, which Motive has identified as essential when considering which AI dash cam to purchase:
  - Accuracy and speed of alerts
  - Image/video quality
  - Alerting style
  - Hardware design

72. The Strategy Analytics report contained tests for five unsafe behaviors that, on information and belief, were selectively chosen by Motive and that are not representative of the full range of Samsara's dash cam functionalities: (i) the driver making a phone call; (ii) the driver sending a text message; (iii) the driver using a cell phone on his or her lap; (iv) close following; and (vi) the driver failing to wear a seatbelt. The study claimed to evaluate the accuracy of each dash cam by tracking whether each product alerted the driver when they engaged in one of the five

tested behaviors.  A dash cam was deemed to fail to detect a behavior if it failed to alert the driver within 30 seconds after the beginning of the unsafe behavior.

73.    The study stated that the Motive AI dash cam successfully detected unsafe driving behaviors 89% of the time, higher than Lytx (61%) and Samsara (15%).  The methodology for the testing, however, was flawed in several respects.  On information and belief, the methodology was purposefully flawed to skew results in Motive's favor, to the detriment of Samsara.

a.    ***First,*** on information and belief, the study did not account for false positives.  It claimed to measure accuracy based on mere purported detection of unsafe behaviors without measuring the rate of false positives for each dash cam.  The false positive rate is an important measure in the industry because a device exhibiting a high false positive rate would cause driver disengagement, frustration, and possibly even distraction.  In short, it would not be acceptable.  Without accounting for, or reporting incidents of, false positives, the purported detection of unsafe behaviors could be severely overstated.

b.    ***Second,*** on information and belief, in tests purporting to measure how well the Samsara camera could detect mobile usage, the operator turned off the "Mobile Usage" feature.  This ensured that the Samsara dash cam would not detect hand activity during the tests seeking to measure accuracy and speed of alerts for texting and phone calls.  In other words, by turning off the "Mobile Usage" feature, the study ensured that Samsara's product would fail this test.

c.    ***Third,*** on information and belief, the study used "out of the box" settings that were not uniform across the tested devices.  There could be no reliable comparison between products if they each were tested with different settings.

d.      **Fourth,** on information and belief, the Strategy Analytics study created testing environments that were inconsistent with Samsara's product settings, which skewed results. For example, on information and belief, Strategy Analytics tested seatbelt use in a way that the Samsara dash cam was not designed to detect. Generally, Samsara's dash cam alerts the driver for failing to wear a seatbelt only at the start of a trip with a default speed threshold of 25 miles per hour, which can be configured at the customer's discretion. The Strategy Analytics study, however, does not state whether it tested Samsara's product only at the start of the trip or whether the speed threshold was met. On information and belief, the results for the Samsara dash cam were flawed because the study tested for seatbelt use at times other than the start of a trip.

e.      **Fifth,** the study was further designed to guarantee failures from Samsara's dash cam. For example, the study marked a "failure" to detect close following if the dash cam did not notify the driver within 30 seconds of the beginning of an unsafe behavior. The Samsara dash cam's "out of the box" settings, however, only alert a driver for close following <u>after</u> 30 seconds have elapsed. On information and belief, Strategy Analytics chose the 30 second threshold for the study without shortening Samsara's "out of the box" settings during tests, which ensured a significantly inflated rate of reported "failures" of Samsara's product.

74.    On information and belief, Motive knew about each of the aforementioned flaws in Strategy Analytics' study. Nevertheless, Motive actively relies on the study to make public claims that its video-based safety solution is better than Samsara's.[37] Specifically, as shown below, Motive states "[e]xperts agree, Motive is the most accurate, fastest AI dash cam," and that Motive's

---

[37] https://gomotive.com/products/dashcam/best-dash-cam/.

"AI Dashcam detects unsafe behavior more accurately than" Samsara's, with Motive's detection accuracy being "89%" compared to Samsara's being "15%." Similarly, Motive states that "Motive is 72% more accurate than Samsara at detecting close following, and alerts drivers 14.2 seconds faster."









**Close following**

Motive is 72% more accurate than Samsara at detecting close following, and alerts drivers 14.2 seconds faster.

Motive is 72% more accurate than Lytx at detecting close following.

[See test results]

00:10:45:04

1:52

75.    Motive has also posted a YouTube video from the study that similarly advertises the Strategy Analytics study as showing that Motive's video-based safety solution is more accurate and detects unsafe driving behavior more quickly than Samsara's video-based safety application.[38] Specifically, Motive states "the Motive AI Dashcam outperformed Lytx and Samsara dash cams in accuracy and speed of AI-based detection of unsafe driving behavior. Motive successfully detected unsafe driving behavior 89% of the time, higher than Lytx (61%) and Samsara (15%)."

---

[38] https://www.youtube.com/watch?v=brRt2h0J80E.



Benchmarking AI Accuracy for Driver Safety

Motive
21.5K subscribers

76.     However, on information and belief, Motive's statements about its products' ability to more accurately and quickly detect unsafe driving behavior are literally false, because—as set forth above—the methodology used in the testing was purposefully flawed to skew results in Motive's favor, to the detriment of Samsara. In other words, the Strategy Analytics study was not sufficiently reliable to permit Motive to conclude that it established the statements Motive made about the superiority of its product to Samsara's.

77.     Motive commissioned its second false study of Samsara's AI video-based safety application in 2023 with the research firm Virginia Tech Transportation Institute (VTTI). Motive retained VTTI to purportedly benchmark the performance of three driver monitoring systems: Motive DC-54, Samsara HW-CM32, and Lytx DriveCam SF400. On information and belief, Motive intentionally commissioned this study to test alerts for unsafe driving behaviors in a

manner inconsistent with Samsara's devices to yield results about the accuracy and success of the driving monitoring systems that would clearly favor Motive, to Samsara's detriment.

78.     VTTI's report purports to assess, *inter alia*, "[h]ow often each of the [driver monitoring systems] produced a successful alert in response to six event types," namely: (i) the driver making a phone call; (ii) the driver lap texting; (iii) the driver texting at a 45-degree angle; (iv) close following; (v) rolling stops; and (vi) the driver failing to wear a seat belt. Ex. 5 (VTTI Report) at 2, 19. The report discloses that the research was "funded by Motive." *Id.* at 6.

79.     The report purported to conduct 234 tests across these six events and reported that Motive was more likely to issue successful alerts more quickly across all events than Samsara, as shown below.

**Table 127 – Comparison of time to alert and average successful alerts across all systems.**

| Task Type | # of tests | Motive | Samsara | Lytx |
|---|---|---|---|---|
| Overall | 234 | 86% (9.4 sec) | 21% (12 sec) | 32% (17 sec) |
| Texting | 39 | 92% (6.9 sec) | 47% (7.5 sec) | 18% (14.5 sec) |
| Phone Call | 39 | 95% (7.5 sec) | 38% (5.5 sec) | 28% (21 sec) |
| Phone in Lap | 39 | 53% (7.0 sec) | 15% (8.7 sec) | 8% (16.2 sec) |
| Close Following | 39 | 100% (15.5 sec) | 28% (26.1 sec) | 36% (13.1 sec) |
| Seat Belt Use | 39 | 100% (15.5 sec) | 0% (n/a) | 100% (20.1 sec) |
| Rolling Stop | 39 | 77% (3.8 sec) | 0% (n/a) | n/a |

80.     Notably, the report stated that, overall, 86% of the time, Motive issued a successful alert within 9.4 seconds of the unsafe behavior, whereas Samsara only issued a successful alert 21% of the time within 12 seconds. This calculation is due, in part, to the report's finding that Samsara's dash cam successfully detected the driver failing to wear a seat belt <u>zero percent</u> of the

time, whereas Motive's product successfully detected that behavior 100% of the time within 15.5 seconds.

81.     The methodology for VTTI's testing, however, was flawed.  Among other things, the seatbelt alert for Samsara's dash cam was not properly enabled during testing, ensuring that it would <u>never</u> issue an alert in response to detecting the driver failing to wear a seatbelt.  On information and belief, Motive was aware of this defect in the testing at the time the testing was conducted, and thus was aware that the results VTTI reported were not only unreliable, but also literally false.  Nevertheless, Motive relied on the results of this report to make several false public claims in advertisements that its driver monitoring systems are superior to Samsara's.

82.     Specifically, as shown below, Motive states that the study shows that "Motive achieves highest alert rates for six unsafe behaviors," with "86% of events successfully alerted to at 9.4 seconds" for Motive, and "21% of events successfully alerted to at 12 seconds" for Samsara.[39]



83.     Motive also claims that Samsara had "0% success" in the seat belt test, compared to Motive's "100% success" rate, as shown below.  Notably, Motive's advertisements make no

---

[39] https://gomotive.com/products/dashcam/fleet-dash-cam-comparison/.

mention of the fact that Samsara's seat belt detection feature was not properly enabled during testing.



## No seat belt

The Virginia Tech driver simulated a seat belt violation by accelerating to 45 mph and driving without a seat belt for at least 30 seconds in 39 tests under various driving conditions, including day, night, and twilight.

- Motive 100% success within 15.5 seconds
- Samsara 0% success
- Lytx 100% success within 20.1 seconds



84.    Motive relies on these statistics to make a number of related false claims, too, including that "The Virginia Tech Transportation Institute and Strategy Analytics found that Motive successfully identifies unsafe driving behavior 4X more accurately than Samsara."[40]  On information and belief, since the commencement of this action, Motive has continued to make false statements about Samsara's products based on the Strategy Analytics and VTTI reports, including in press releases and other public-facing communications.

85.    Motive's statements about its product's ability to more accurately and quickly detect unsafe driving behaviors are literally false because—as set forth above—the methodology used in testing these behaviors, particularly as to seat belt detection, was flawed to ensure that Samsara's device would not perform.  Like the Strategy Analytics study, the VTTI study was not sufficiently reliable to permit Motive to conclude that it established the statements Motive made about the superiority of its product to Samsara's, and Motive was aware of that.

---

[40] https://gomotive.com/motive-vs-samsara/#compare-chart.

86.     Tellingly, VTTI expressly acknowledged the flaws with its methodology in an amended version of the report, published on August 13, 2023—less than two months after the original was issued.  The amended report explicitly states that the "seatbelt alert for the Samsara device was not properly enabled" during testing.  Ex. 6 (Amended VTTI Report) at 3.

87.     Thus, on information and belief, in addition to being aware of this defect during the testing itself, Motive was also explicitly put on notice by VTTI of the defect in its amended report. Nevertheless, Motive continues to promote the false advertisements described above.

88.     Motive has also used these studies to make false claims about the quality of the Samsara AI video-based safety application and drivers' preference for Motive's solution over Samsara's.  For example, Motive claims on its website that "[d]rivers prefer Motive's video and image quality," citing the Strategy Analytics study's images taken outside at dusk.[41]



89.     But the Strategy Analytics report actually shows that customers prefer **Samsara's** AI video-based safety solution over Motive's and Lytx's for "outside at dusk" performance, "outside field of view" performance, and "quick capture button" features.

---

[41] https://gomotive.com/products/dashcam/best-dash-cam/.







90.     Thus, Motive's sweeping statement that "[d]rivers prefer Motive's video and image quality" to Samsara's is false, because the Strategy Analytics study only reported drivers as rating <u>certain</u> aspects of Motive's video and image quality as preferred to Samsara's.  Furthermore, Motive's use of the study's images taken outside at dusk to support its claim is false, because the Strategy Analytics study clearly reported that drivers prefer Samsara's camera for outside at dusk performance over Motive's.

91.     On information and belief, the Strategy Analytics and VTTI reports were not the first time that Motive paid a third party to purchase Samsara's products and publish a negative, misleading review of the product's performance and features.  On information and belief, in May 2020, a paid Motive consultant recorded and uploaded to YouTube a negative review of Samsara's dash cams, which contained multiple false and misleading statements about the Samsara product.  When Samsara's Legal Team emailed the consultant to demand that the video be removed from YouTube, the consultant complied.  But six months later, the video was reposted to YouTube by Mr. Gupta, Motive's Vice President of Product.

### MOTIVE'S SOLICITATION OF SAMSARA EMPLOYEES

92.     As part of its scheme to copy Samsara's business plan, Motive has also actively solicited Samsara employees to join Motive's workforce to acquire Samsara's confidential information relating to current and future product plans, sales, and prospective and existing customers.

93.     On information and belief, Motive's solicitation efforts have been widespread, and it has sought to recruit professionals across junior roles, senior roles, and everything in between.  To date, Motive has successfully poached a member of Samsara's Sales Operations team and a Senior Account Executive, offering, on information and belief, these employees outsized compensation packages.

94.     Motive's tactics have become increasingly more aggressive over time, with its CEO personally texting and meeting in person with Samsara's mid-level sales representatives to lure them to Motive.  On information and belief, the CEO has personally offered Samsara employees compensation packages of half-a-million dollars or more for positions that typically command a market rate that is a fraction of that salary.  As recently as this month, a Motive "User Researcher"

contacted a former Samsara Sales Engineer and offered him a £125 Amazon gift card in exchange for an hour-long meeting to discuss his experience at Samsara and telematics in the EMEA region.

95.    In addition, as recently as January 2024, a Motive "User Researcher" contacted a former Samsara Sales Engineer and offered him a £ 125 Amazon gift card in exchange for an hour-long meeting to discuss his experience at Samsara and telematics in the EMEA region.

96.    On information and belief, Motive's tactics are aimed at recruiting Samsara professionals who will divulge and bring Samsara's competitive business information to Motive. And, on information and belief, Motive is targeting Samsara customers, prospective customers, and partners whose relationships were handled by the same Samsara employees who have since been lured to Motive.

## MOTIVE'S CONDUCT HAS CAUSED SAMSARA SUBSTANTIAL HARM

97.    Samsara has been harmed, and continues to be harmed, by Motive's willful infringement of Samsara's patent rights.

98.    Upon information and belief, Motive profits commercially by infringing Samsara's patents, including the patents asserted in this complaint, and wrongfully deprives Samsara of market share, revenue, and profit by selling its infringing products in the U.S. market.  As a result of Motive's conduct, Samsara has been harmed in an amount to be determined according to proof at trial.

99.    At least part of the harm suffered by Samsara due to Motive's infringement is irreparable and cannot be redressed by any adequate remedy at law.  Upon information and belief, unless enjoined by this Court, Motive intends to continue to infringe Samsara's patents.  Indeed, Motive's CEO has acknowledged that competition in its market is "zero sum" and "win or lose":[42]

---

[42] Grit Podcast at 55:05–55:59.

Once a customer is lost to a competitor, one cannot get another deal for another "four years," or potentially longer depending on the contract term, and even then, due to the costs of switching out hardware devices across an entire organization and training personnel on a new system, only when the incumbent is letting the customer down.[43]

100.    Accordingly, Samsara has suffered irreparable harm and will continue to suffer irreparable harm unless Motive is enjoined from using and promoting its infringing products. Samsara has no adequate remedy at law to fully redress the injuries that Motive has caused and intends to cause by its conduct.

101.    Samsara has also been harmed by Motive's false and misleading statements about the reliability, efficacy, and functionality of Samsara's products.  Not only are Motive's false statements likely to influence consumers to buy competitors' products over Samsara's, to Samsara's financial detriment, but they also harm Samsara's reputation for producing top-of-the-line products and technology that can effectively increase driver and road safety.

102.    Samsara has also been harmed by Motive's fraudulent scheme to access Samsara's platform and technology.  Samsara's harm includes, among other things, the loss of competitive information, the expenditure of substantial time and resources of employees who conducted internal investigations regarding Motive's creation and use of fictitious accounts, and harm resulting from Motive's use of Samsara's competitive, confidential information to develop copycat products and services, which it could not have created but for its use of Samsara's material.

## THE SAMSARA PATENTS

103.    Samsara's products incorporate numerous patented technologies developed and owned by Samsara.  Three examples of Samsara's patented technologies are described below

---

[43] *Id.*

(collectively, "the Samsara Patents" or "Patents-in-Suit"). These patented technologies represent important developments and innovations in fleet telematics and AI-enabled driver safety products.

### a.    U.S. Patent No. 11,190,373

104.    U.S. Patent No. 11,190,373 ("the '373 Patent"), titled "Vehicle Gateway Device and Interactive Graphical User Interfaces Associated Therewith," issued on November 30, 2021 to inventors Alexander Stevenson, Wendy Greenberg, Josephine Nord, Matvey Zagaynov, Jennifer Leung, Andrew Robbins, Michael Ross, Aaron Szerlip, and Rushil Goel.  A true and correct copy of the '373 Patent is attached as Exhibit 1 to this Complaint.

105.    Samsara is the owner and sole assignee of the '373 Patent and has the full right to enforce and/or license the '373 Patent.

106.    The '373 Patent is valid and enforceable.

107.    Exemplary claim 15 of the '373 Patent recites:

> 15. A system comprising:
>
> > [15][i] a first vehicle gateway device configured to gather and transmit first vehicle metric data associated with a first vehicle; and
> >
> > [15][ii] a computing device comprising:
> >
> > > [15][ii][a] a computer readable storage medium having program instructions embodied therewith; and
> > >
> > > [15][ii][b] one or more processors configured to execute the program instructions to cause the computing device to:
> > >
> > > [15][ii][c] receive vehicle metric data from a plurality of vehicle gateway devices associated with a plurality of vehicles;
> > >
> > > [15][ii][d] determine, from the vehicle metric data, fuel/energy usage of the plurality of vehicles over various periods of time;
> > >
> > > [15][ii][e] determine correlations among one or more other vehicle metrics and the fuel/energy usage of the plurality of vehicles over the various periods of time;

[15][ii][f] determine weightings of the one or more other vehicle metrics based at least in part on the determined correlations;

[15][ii][h] receive, from the first vehicle gateway device, the first vehicle metric data associated with the first vehicle;

[15][ii][i] determine, based on the determined weightings and the first vehicle metric data, a fuel/energy efficiency score associated with the first vehicle; and

[15][ii][j] cause the fuel/energy efficiency score to be provided in an alert, report, or interactive graphical user interface.

108.   The inventors of the '373 Patent faced several problems.  For example, due to the complexity and diversity of the activities of vehicles in a commercial fleet, it was very difficult to determine why and how the fuel and energy of vehicles are used, let alone how to increase their usage efficiency.  Additionally, the data related to the activities of vehicles in a commercial fleet could be voluminous, leading to technical difficulties with collecting the data related to those activities. Ex. 1 at 1:64–2:5.  Moreover, fleet operators could not compile information across other fleets and hence lacked information that would let them know how their vehicle usage efficiencies compared with other operators.  *See, e.g.*, *id.* at 3:27–4:13.

109.   Claim 15 of the '373 Patent recites a system that overcomes these problems with respect to measurement of fuel efficiency.  The system includes a vehicle gateway device and a computing device.  The vehicle gateway device gathers and transmits vehicle metric data from a first vehicle.  The computing device receives vehicle metric data from the vehicle gateway device and determines, from the vehicle metric data gathered from that and other vehicles, fuel/energy usage of the plurality of vehicles over various periods of time. The computing device determines correlations among one or more other vehicle metrics and the fuel/energy usage of the plurality of vehicles over the various periods of time.  The computing device determines weightings of the one or more other vehicle metrics based at least in part on the determined correlations.  The computing

device determines, based on the determined weightings and the vehicle metric data, a fuel/energy efficiency score associated with the first vehicle. The computing device then allows the fuel/efficiency score to be displayed as an, *e.g.*, alert, report, or interactive graphical user interface.

110.     The recited system was unconventional and not well understood at the time of the invention of the '373 Patent.  Further, such a system implements a specific solution using correlations and weightings between vehicle metrics and fuel/energy usage. Nor could such a system be implemented in the human mind, as it required implementation with computers and electronic equipment, *e.g.*, to receive electronic data from the vehicle gateway device, compute the necessary correlations and weightings, and calculate a fuel/efficiency score.

### b.     U.S. Patent No. 11,127,130

111.     U.S. Patent No. 11,127,130 ("the '130 Patent"), titled "Machine Vision System and Interactive Graphical User Interfaces Related Thereto," issued on September 21, 2021 to inventors Anubhav Jain, John Bicket, Yu Kang Chen, Arthur Pohsiang Huang, Adam Eric Funkenbusch, Sanjit Zubin Biswas, Benjamin Arthur Calderon, Andrew William Deagon, William Waldman, Noah Paul Gonzales, Ruben Vardanyan, Somasundara Pandian, Ye-Sheng Kuo, and Siri Amrit Ramos.  A true and correct copy of the '130 Patent is attached as Exhibit 2 to this Complaint.

112.     Samsara is the owner and sole assignee of the '130 Patent and has the full right to enforce and/or license the '130 Patent.

113.     The '130 Patent is valid and enforceable.

114.     Exemplary claim 1 of the '130 Patent recites:

1.   A machine vision system comprising:

[1][i] an image sensor;

[1][ii] a computer readable storage medium having program instructions embodied therewith, the program instructions including at least a web

server configured to provide communication with other computer devices; and

[1][iii] one or more processors configured to execute the program instructions to cause the system to:

> [1][iii][a] acquire an image via the image sensor;

> [1][iii][b] process the image to identify one or more features in the image;

> [1][iii][c] determine an evaluation of the image based at least [i]n part on the one or more features;

> [1][iii][d] locally store the image and the evaluation;

> [1][iii][e] transmit the image and evaluation for remote storage; and

> [1][iii][e] execute the web server to provide secure remote access to the image and evaluation.

115.    The '130 Patent is directed toward machine vision systems, which are also referred to as "smart cameras." Ex. 2 at 1:41-42.  A problem facing the inventors of the '130 Patent was providing the proper configurations and setting information to machine vision systems.  *See id.* at 2:1–7.  Another problem faced by the inventors of the '130 Patent was to gather data from machine vision systems in a fast and efficient manner to enable real time or near-real time analysis.  *Id.* at 2:7–12.  These problems made it difficult to handle situations where a machine vision device fails and needed to be updated.  *Id.* at 2:12–17.

116.    The '130 Patent teaches, among other things, a machine vision system that acquires images with an image sensor, processes the images and determines evaluations of the images, locally stores the images and the evaluations, and transmits the images and evaluations for remote storage.  An exemplary machine vision system includes a web server to provide communication with other computers, including providing secure remote access to the stored images and evaluations.

117.    The patented systems achieve advantages not present in prior art products.  For example, they have built-in wireless and/or wired communications capabilities. Ex. 2 at 3:19–49. Further, they provide an easy-to-deploy and easy-to-monitor computer vision system that makes automated inspection affordable and fast to deploy across many sites.  The systems combine built-in connectivity and automated traceability reporting with advanced image processing capability to reduce defects and make previously complex inspection challenges affordable. Further, the system enables centrally managed and deployed verification programs that reduce downtime. *See id.* at 3:50–62.

118.    The use of the components in a machine vision system recited in claim 1 and its dependent claims was unconventional and not well understood at the time of the invention of the '130 Patent.  Conventional machine vision systems did not include the ability to, inter alia, determine evaluations of images locally and to execute web servers to provide secure remote access to the images and evaluations.  Further, the system recited in claim 1 (and its dependent claims) cannot be implemented in the human mind, and instead requires implementation with computers and electronic equipment (*e.g.*, image sensor, processors, and web server).

### c.    U.S. Patent No. 11,611,621

119.    U.S. Patent No. 11,611,621 ("the '621 Patent") is titled "Event Detection System" and issued on March 21, 2023 to inventors Saleh ElHattab, Justin Joel Delegard, Bodecker John Dellamaria, Brian Tuan, Jennifer Winnie Leung, Sylvie Lee, Jesse Michael Chen, Sean Kyungmok Bae, Angel Manalastas Lim, and Timothy John Passaro.  A true and correct copy of the '621 Patent is attached as Exhibit 3 to this Complaint.

120.    Samsara is the owner and sole assignee of the '621 Patent and has the full right to enforce and/or license the '621 Patent.

121.    The '621 Patent is valid and enforceable.

122.    Exemplary claim 8 of the '621 Patent reads:

8. A method comprising:

[8][i] accessing a first data stream from the plurality of data streams generated by a first sensor device mounted at the vehicle;

[8][ii] detecting a feature within the first data stream generated by the first sensor device mounted at the vehicle, the feature comprising an image feature that corresponds with an event type from among a plurality of event types, the event type comprising a set of conditions that correspond with a procedure that comprises an identification of at least a second sensor device from among a plurality of sensor devices mounted at the vehicle, the procedure associated with a traffic sign represented by the image feature;

[8][iii] selecting the second sensor device based on the procedure that corresponds with the event type, in response to the detecting the feature that corresponds with the event type within the first data stream;

[8][iv] accessing a second data stream generated by the second sensor device, the second data stream comprising a set of attributes;

[8][v] identifying a client device based on the detecting the feature that corresponds with the event; and

[8][vi] presenting a notification that includes an event indicator at the client device based on the set of attributes from the second data stream.

123.    Event data records (EDRs) have included devices that record data including video, acceleration, deceleration, speed, steering angle, global positioning system (GPS) data, and throttle position information. Such systems, however, lacked the functionality to efficiently detect and monitor safety events and precursors to safety events, in real-time, let alone to provide interfaces to enable users to manage and view the recorded data.

124.    The patented methods and systems overcame this problem and led to novel event detection systems with improved functionalities compared to prior art systems. For example, claim 8 recites a specific method that uses data from two sensor devices to recognize safety events. Data from the first sensor device (a camera) is used to determine, *e.g.*, visual features. This data is subsequently augmented with data from a second sensor to provide a detection of the event.

**MOTIVE'S INFRINGEMENT**

125.    Motive has offered for sale, sold, used, made, distributed, and imported into the United States hardware products including the Motive Vehicle Gateway; the Motive AI Dashcam; and the Motive AI Omnicam.  Further, Motive has offered for sale, sold, and used in the United States software analysis services implemented on the cloud, including the Motive Dashboard, the Motive Safety Hub, and the Motive Driver Fuel Score.  In addition, Motive provides training and instruction to its customers in the United States in using the above-mentioned products and services.

126.    On information and belief, Motive has been aware of Samsara's patent portfolio and specifically of the Patents-in-Suit.  For example, Samsara informed Motive on September 26, 2023 of its patent portfolio.  *See* Ex. 7.  Samsara subsequently informed Motive on January 23, 2024 of the Patents-in-Suit and provided claim charts explaining how Motive has been infringing them.  *See* Ex. 8.  In addition, Motive has been aware of each of the Patents-in-Suit, and of its infringement of the same, since at least January 24, 2024, when Samsara filed its Complaint in this Court.

**COUNT I — INFRINGEMENT OF U.S. PATENT NO. 11,190,373**

127.    Samsara repeats and re-alleges each and every allegation in paragraphs 97–100, 103–110, and 125–126 as if fully set forth herein.

128.    The United States Patent and Trademark Office ("USPTO") duly and legally issued the '373 Patent on November 30, 2021.

129.    Motive has infringed, and continues to infringe, one or more claims of the '373 Patent, including at least claim 15, either literally or under the doctrine of equivalents, by making, using (including by testing), selling, offer for sale, and/or importing into the United States products

and services, including the Motive Vehicle Gateway and Motive's Fuel Score that are covered by one or more claims of the '373 Patent. Motive's infringement is ongoing.

130.    For example, Motive has infringed, and continues to infringe, at claim 15 of the '373 Patent. *See* Ex. 1.

131.    The preamble of claim 15 of the '373 Patent recites: "A system comprising." To the extent the preamble is limiting, the Motive Vehicle Gateway (which operates onboard a vehicle) together with the cloud computers that, on information and belief, run the Motive Data Platform and AI-Powered Applications (including the Fuel Score feature) constitute a "system."



Ex. 9 (Motive System Overview) at 1.

132.    Limitation [15][i] of claim 15 of the '373 Patent recites: "a first vehicle gateway device configured to gather and transmit first vehicle metric data associated with a first vehicle." Motive's Vehicle Gateway is a vehicle gateway device that is configured to collect and transmit vehicle metric data (such as speed, fuel, fault codes, barometric pressure, battery voltage, coolant temp, engine intake temp, and engine load) associated with a first vehicle.



Ex. 10 (Spec Sheet: Vehicle Gateway) at 2.

133.    Limitation [15][ii] of claim 15 of the '373 Patent recites "a computing device." Motive provides a suite of AI-Powered Applications run on the cloud, which constitutes one or more computing devices.

134.    Limitations [15][ii][a] and [15][ii][b] of claim 15 of the '373 Patent recites: "a computer readable storage medium having program instructions embodied therewith"; and "one or more processors configured to execute the program instructions to cause the computing device to [perform certain functions]."  Motive's suite of AI-Powered Applications run on the cloud, which includes a computer readable storage medium with program instructions.  The cloud computers running the AI-powered applications include processors configured to execute program instructions that implement the various AI-powered Applications, including those recited in subsequent limitations of claim 15.

135.    Limitation [15][ii][b][w] of claim 15 of the '373 Patent recites: "program instructions to cause the computing device to receive vehicle metric data from a plurality of vehicle gateway devices associated with a plurality of vehicles."  Motive's Data Platform and AI-Powered Applications receive vehicle metric data from multiple vehicle gateway devices associated with multiple vehicles.  For example, on information and belief, the Data Platform identifies different

vehicles in a fleet and specifies various pieces of information for each, where at least some of this

information was received from the vehicle gateway on each of the vehicles:



*How to View Fuel Hub Driver Details*[44]



*How to View Fuel Hub Driver Details*[45]

136.    Limitation [15][ii][b][x] recites: "program instructions to cause the computing

device to … determine, from the vehicle metric data, fuel/energy usage of the plurality of vehicles

---

[44] https://helpcenter.gomotive.com/hc/en-us/articles/6173246145053-How-to-view-Fuel-Hub-Driver-Details
[45] https://helpcenter.gomotive.com/hc/en-us/articles/6173246145053-How-to-view-Fuel-Hub-Driver-Details

over various periods of time." On information and belief, Motive's Data Platform and AI-Powered Applications together determine, from collected vehicle metric data, fuel/energy usage of the plurality of vehicles over various periods of time. The Data Platform and AI-Powered Applications determine a Fuel Score between 10 and 100 for each driver (of a specific vehicle) based on fuel efficiency calculations. The Fuel Score is determined based on variables such as idling, speeding, RPM, and other factors. On information and belief, Motive's Data Platform and AI-Powered Applications also consider factors outside of the driver's control in score determinations by comparing one fleet's drivers to other drivers in the Motive network with similar vehicles, environmental conditions, and load states.



*What is Fuel Hub?*[46]

---

[46] *Id.*

137.    On information and belief, Motive's Data Platform and AI-Powered Applications determine fuel trends, fuel efficiency factors, driver performance, vehicle performance, and make/model performance over various periods of time:

**Summary**

1. In the **Summary** metrics bar, you can view key fuel consumption metrics for your fleet for the selected time period. You can switch between different time periods by using the time toggle in the top right. Adjusting the time toggle will update the Summary metrics along with the dashboard graphs and charts below (**Fuel Trends, Fuel Efficiency Factors, Driver Performance, Vehicle Performance,** and **Make & Model Performance**). These metrics will help you quickly understand how the fleet's activity trended from the previous time period. If you are viewing the Dashboard in metric units, you will be able to view these charts in KM/L.

*What is Fuel Hub?*[47]

138.    Motive's Data Platform and AI-Powered Applications also determine the amount of fuel used, fuel cost, idle fuel, and fuel wasted for various time periods:



*What is Fuel Hub?*[48]

139.    Limitation [15][ii][b][y] recites: "program instructions to cause the computing device to … determine correlations among one or more other vehicle metrics and the fuel/energy usage of the plurality of vehicles over the various periods of time."

[47] *Id.*
[48] *Id.*

140.    On information and belief, Motive's Data Platform and AI-Powered Applications together determine correlations, or trends, among the vehicle metrics and fuel/energy usage of the plurality of vehicles over various periods of time.  On information and belief, the Motive AI-Powered Applications compute the Fuel Score by correlating a driver's performance (using vehicle metrics) to the performance of other drivers (using metrics derived from other vehicles).  According to Motive's literature, Fuel Score is computed in part by normalizing, across vehicles, variables that affect fuel economy but that are outside the control of a driver (*e.g.*, environmental conditions, load state, vehicle model).  On information and belief, this normalization step involves determining correlations between such environmental variables and fuel/energy usage.



*What is Fuel Hub?*[49]

141.    Based on the above calculations, Motive computes a fleet's Fuel Score, fuel usage (miles per gallon), and idling rate over time, as well as the Moving Average measure of fuel use:

---

[49] *Id.*

1. In the **Fuel Trends** graph, you can view a 90-day trend of the metrics below:

- FUEL SCORE: Understand the fuel consumption of your fleet.



- AVG. MPG: Understand your fleet's average MPG (Miles per Gallon) performance over a 90 day period and compare against the Motive network average.





*What is Fuel Hub?*[50]

142.    Limitation [15][ii][b][z] recites: "program instructions to cause the computing device to … determine weightings of the one or more other vehicle metrics based at least in part on the determined correlations."  On information and belief, the Motive AI-Powered Applications determine weightings of the one or more vehicle metrics based at least in part on the determined correlations.  The Fuel Score provides a measure of "[t]he amount of total fuel saved within a given day trend."  On information and belief, this score is based on fuel usage, as well as other vehicle metrics such as engine performance (RPM profile, idling duration, *etc.*), after removing the effect of other variables on fuel/energy usage.  On information and belief, determining Fuel Score entails determining weightings of vehicle metrics in the calculation of Fuel Score.

---

[50] *Id.*



*What is Fuel Hub?*[51]

143.    Limitation [15][ii][b][ww] recites: "program instructions to cause the computing device to … receive, from the first vehicle gateway device, the first vehicle metric data associated with the first vehicle."  Motive's Data Platform and AI-Powered Applications together receive vehicle metric data associated with an individual vehicle, such as average miles per gallon (MPG), moving MPG, total distance, utilization, driving fuel, idling fuel, and fuel cost:

---



*How to View Fuel Hub Driver Details*[52]

144.    Motive's Data Platform and AI-Powered Applications receive vehicle metric data associated with an individual driver and the driver's individual vehicle:



*How to View Fuel Hub Driver Details*[53]

---

[52] https://helpcenter.gomotive.com/hc/en-us/articles/6173246145053-How-to-view-Fuel-Hub-Driver-Details
[53] https://helpcenter.gomotive.com/hc/en-us/articles/6173246145053.

145.    The vehicle metrics associated with individual drivers and their individual vehicles include average MPG, moving MPG, distance, utilization, driving fuel, idling fuel, PTO time, fuel cost, and estimated deadhead:

The Driver List shows the following metrics:

- **Avg MPG:** Your driver's average Miles Per Gallon performance.

- **Moving MPG:** Miles Per Gallon performance when the vehicle is in motion.

- **Total Dist:** Total miles driven by the driver.

- **Utilization:** Time your vehicle was driving as a percentage of the total time your engine was running and PTO was engaged (drive time + idle time + PTO time).

- **Driving:** Total fuel consumed when the vehicle is in motion.

- **Idling:** Total fuel consumed when a vehicle is stationary and PTO is off but the engine is running.

- **PTO Time:** Total time PTO was engaged across all vehicles and AUX inputs.

(**Note:** this would show up if at least one of your connected AUX inputs has equipment type mentioned as PTO)

- **Fuel Cost:** Total cost of fuel consumed by the driver.

- **Est. Deadhead:** Total estimated miles driven while the vehicle was unloaded.

*How to View Fuel Hub Driver Details*[54]

146.    Limitation [15][ii][b][xx] recites: "program instructions to cause the computing device to … determine, based on the determined weightings and the first vehicle metric data, a fuel/energy efficiency score associated with the first vehicle."  Motive's Data Platform and AI-Powered Applications determine, based on the weightings and individual vehicle metric data, a fuel/energy efficiency score or a vehicle performance score:

---

[54] *Id.*



*What is Fuel Hub?*[55]

147.    Limitation [15][ii][b][yy] recites: "program instructions to cause the computing device to … cause the fuel/energy efficiency score to be provided in an alert, report, or interactive

---

[55] https://helpcenter.gomotive.com/hc/en-us/articles/6161577899165-What-is-Fuel-Hub-.

graphical user interface."  Motive's Data Platform and AI-Powered Applications together cause the fuel/energy efficiency score to be provided in a report or interactive graphical user interface, for example in the Motive Fleet Dashboard:



## Vehicle Performance

1. The **Vehicle Performance** leaderboard gives you a quick view into your bottom and top performing vehicles. This helps you determine the types of vehicles you want to invest in — or possibly get rid of. Vehicles are ranked by fuel economy and you click on the vehicle to see their MPG for the selected time period & how it has changed compared to the previous time period.



*What is Fuel Hub?*[56]

---

[56] *Id.*

148.    In addition to directly infringing the '373 Patent, Motive indirectly infringes one or more claims of the '373 Patent including at least claim 15, by actively inducing others, including its customers, to directly infringe the '373 Patent in violation of 35 U.S.C. § 271(b). Specifically, in light of Motive's knowledge of the '373 Patent and of its infringement, Motive has induced infringement of the patent with specific intent to do so, by its activities relating to the marketing, distribution, and/or sale of its products and services to purchasers and customers, including the Vehicle Gateway as used with the Fuel Score feature, and by instructing and encouraging purchasers and customers (including via product documentation) to operate and use those products and services in an infringing manner with knowledge that these actions would infringe the '373 Patent.  For example, Motive instructs its customers on how to view, understand, and use the Fuel Score feature on the Motive Fuel Hub.  *See, e.g.*, https://helpcenter.gomotive.com/hc/en-us/articles/6161577899165-What-is-Fuel-Hub;        https://helpcenter.gomotive.com/hc/en-us/articles/6173246145053-How-to-view-Fuel-Hub-Driver-Details.  As another example, Motive provides prospective and existing customers with an instructional book on the Motive Fuel Score.[57]

149.    Motive has contributed to infringement of the '373 Patent by others by selling and/or offering for sale to Motive's purchasers and customers within the United States and/or importing into the United States products and services, including the Vehicle Gateway and the Fuel Score feature, that are especially made and/or adapted for infringing the '373 Patent and are not staple articles of commerce suitable for substantial non-infringing uses and that have been sold to purchasers and customers who infringe the '373 Patent.  Specifically, and in light of the

---

[57] *See* https://go.gomotive.com/WC-2022-04-PHX-Reduce-Fuel-Costs-Guide.html?utm_campaign=PSLK-2022-04-PHX-Reduce-Fuel-Costs-Guide&utm_medium=paid-social&utm_source=linkedin&utm_content=Reduce-Fuel-Costs-Guide (Fuel Score 101).

knowledge of the '373 Patent by Motive as previously alleged, Motive has knowledge that its products and services, including the Vehicle Gateway and the Fuel Score feature, are specifically made and/or adapted for infringement of the '373 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

150.    Motive's infringement of the '373 Patent has caused and continues to cause damage and irreparable injury to Samsara, and Samsara will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

151.    Due to Motive's infringement of the '373 Patent, Samsara is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, and 283–284.

152.    Motive continues to infringe the '373 Patent as alleged above, despite having knowledge of the patent, and is acting with willful, intentional, and conscious disregard of the objectively high likelihood that its acts constitute infringement of the '373 Patent.

## COUNT II — INFRINGEMENT OF U.S. PATENT NO. 11,127,130

153.    Samsara repeats and re-alleges each and every allegation in paragraphs 97–100, 103, 111–118, and 125–126 as if fully set forth herein.

154.    The USPTO duly and legally issued the '130 Patent on September 21, 2021.

155.    Motive has infringed, and continues to infringe, one or more claims of the '130 Patent, including at least claim 1, either literally or under the doctrine of equivalents, by making, using (including by testing), selling, offer for sale, and/or importing into the United States products that are covered by one or more claims of the '130 Patent.  These products include the Motive AI Dashcam or the AI Omnicam and the Motive Vehicle Gateway, which are used with the Motive cloud platform.  Motive's infringement is ongoing.

156.    For example, Motive has infringed, and continues to infringe, at claim 1 of the '130 Patent.  *See* Ex. 2.

157.    The preamble of claim 1 of the '130 Patent recites: "A machine vision system comprising:"  To the extent the preamble is limiting, the Motive AI Dashcam or the Motive AI Omnicam, together with the Motive Vehicle Gateway and the Motive cloud platform, constitute a machine vision system.  The dashcams detect unsafe driving events using advanced computer vision algorithms, and the Vehicle Gateway provides connectivity between the cloud platform and the dash cams (the AI Omnicam also has its own connectivity).  *See* Exs. 10-12.

158.    Limitation [1][i] of claim 1 of the '130 Patent recites: "an image sensor."  The AI Dashcam has two image sensors.  It has both a "road-facing" digital camera and a "driver-facing" digital camera, each of which includes an "image sensor."  Ex. 11 at 4.  The AI Omnicam has one image sensor (a digital camera).  Ex. 12 at 3–4.

159.    Limitation [1][ii] of claim 1 of the '130 Patent recites: "a computer readable storage medium having program instructions embodied therewith, the program instructions including at least a web server configured to provide communication with other computer devices."  On information and belief, the Motive system (including the AI Dashcam and/or the AI Omnicam, the Vehicle Gateway, and the Motive cloud platform) includes computer readable storage mediums having program instructions embedded therewith, including processor RAM.  On information and belief, the program instructions include at least a web server configured to provide communication with other computer devices.  The Motive cloud platform has secure internet connectivity with the Motive dash cams at least via the Vehicle Gateway.  The Vehicle Gateway provides connectivity (high-speed LTE) between the Motive cloud platform and the AI Dashcam and/or the AI Omnicam.  Ex. 11 at 5.  The AI Omnicam also has its own built-in 4G connectivity to the Motive cloud platform.  Ex. 12 at 4.  The software (including firmware) that implement that 4G connectivity, as well as associated software that provides communication with other computer

devices, constitutes a web server. In addition, the Motive cloud platform used by Motive customers includes a web server that provides secure remote access to the stored images and evaluations.

160.    Limitation [1][iii] of claim 1 of the '130 Patent recites: "one or more processors configured to execute the program instructions to cause the system to:" On information and belief, the Motive system (including the AI Dashcam and/or AI Omnicam, the Vehicle Gateway, and the Motive cloud platform) has one or more processors configured to cause the system to perform the below recited actions.

161.    Limitation [1][iii][a] of claim 1 of the '130 Patent recites that the "one or more processors [are] configured to execute the program instructions to cause the system to acquire an image via the image sensor." On information and belief, the AI Dashcam and the AI Omnicam have one or more processors that execute software program instructions that cause each to acquire digital images using their digital cameras.

162.    Limitation [1][iii][b] of claim 1 of the '130 Patent recites that the "one or more processors [are] configured to execute the program instructions to cause the system to … process the image to identify one or more features in the image." On information and belief, the AI Dashcam and AI Omnicam have software that process images captured by their digital cameras to identify features related to traffic violations or unsafe driving. For example, the AI Dashcam identifies features in the image related to distracted driving and/or "hard brakes." As another example, the AI Omnicam detects, *e.g.*, features in the image related to unsafe lane changes.



Ex. 11 at 3.[58]



**Instantly detect risk with the industry's most accurate AI**

Proactively eliminate blind spots and prevent accidents with a wider field of view. Upcoming AI detects risky behaviors like:

· Unsafe lane changes.
· Incorrect cargo loading.
· Improper use of safety gear and heavy machinery.

**Key features that make it possible**

· State-of-the-art computer vision algorithms
· Leading edge AI processor
· Ultra wide-field cameras

Unsafe lane change

Ex. 12 at 2.

163.    Limitation [1][iii][c] of claim 1 of the '130 Patent recites that the "one or more processors [are] configured to execute the program instructions to cause the system to … determine an evaluation of the image based at least in part on the one or more features."  On information and belief, the AI Dashcam and AI Omnicam determine evaluations of images, such as unsafe driving events or distracted driver events.  For example, the AI Dashcam identifies distracted driving and/or "hard brake" events.  As another example, the AI Omnicam detects unsafe lane changes.

**Instantly detect risk**

**High-risk event detection and upload**

Real-time AI detection:

· **Violations**
  · Stop sign violation
· **Core risk**
  · Close following
  · Unsafe lane change
· **Driver awareness**
  · Cell phone usage
  · Distraction
  · Seat belt violation

Telematics detection:

· **Violations**
  · Speeding
· **Harsh driving**
  · Hard brake
  · Hard acceleration
  · Hard corner

Collision detection:

· Collision
· Near collision

---

[58] https://gomotive.com/products/dashcam/.

Ex. 11 at 3.



Ex. 12 at 2.

164.    Limitation [1][iii][d] of claim 1 of the '130 Patent recites that the "one or more processors [are] configured to execute the program instructions to cause the system to … locally store the image and the evaluations."  On information and belief, the AI Dashcam and AI Omnicam locally store the images they take that may potentially contain significant events.  The Motive blog post *Why and How We Measure Driver Performance* explains that Motive dashcams locally "save video[s]" of potentially severe Driver Performance Events ("DPEs"):



*Why and How We Measure Driver Performance* (Jan. 14, 2020).[59]

165.    Limitation [1][iii][e] of claim 1 of the '130 Patent recites that the "one or more processors [are] configured to execute the program instructions to cause the system to … transmit the image and evaluation for remote storage."  On information and belief, both the AI Dashcam and AI Omnicam transmit images and evaluations (analysis) of the images for storage onboard the cloud at least via the Vehicle Gateway.  Specifically, they transmit images associated with detected high-risk events and the DPE logic (reflecting evaluations of the images).  For example, the Motive blog post *Why and How We Measure Driver Performance* explains that the Motive cloud retrieves DPE logic and DPE videos from the cameras.  The transmitted images and their evaluations are stored remotely on the Motive cloud.  *See supra*.

166.    Limitation [1][iii][f] of claim 1 of the '130 Patent recites that the "one or more processors [are] configured to execute the program instructions to cause the system to … execute the web server to provide secure remote access to the image and evaluation."  On information and belief, at least the Motive Vehicle Gateway provides remote access for the Motive cloud to "fetch" the videos stored onboard the AI Dashcam and/or the AI Omnicam.  The Motive blog post also explains that the candidate DPE logic determined by the AI Dashcam / AI Omnicam is sent to the Motive cloud platform via the Vehicle Gateway.  *See supra*.  Videos and other data associated with DPEs are subsequently provided to Motive fleet customers.

---

[59] https://medium.com/motive-eng/why-and-how-we-measure-driver-performance-768d5316fb2c.

## How We Deliver DPE Reports and Driver Scores to Fleet Managers

The video of the DPE (see the example below), along with its assigned tags, then becomes available for fleet managers to view on their dashboard. On average, the entire process to collect DPE data and populate an annotated video on a fleet manager's dashboard takes less than five minutes.



Video of a DPE delivered to a fleet manager's dashboard

*Why and How We Measure Driver Performance* (Jan. 14, 2020).[60]

167.    In addition to directly infringing the '130 Patent, Motive indirectly infringes one or more claims of the '130 Patent including at least claim 1, by actively inducing others (including its customers) to directly infringe the '130 Patent in violation of 35 U.S.C. § 271(b).  Specifically, in light of Motive's knowledge of the '130 Patent, Motive has induced infringement of the patent

---

[60] *Id.*

with specific intent to do so, by its activities relating to the marketing, distribution, and/or sale of its products to purchasers and customers, including the Vehicle Gateway, AI Omnicam, and AI Dashcam and associated software, and by instructing and encouraging purchasers and customers (including via product documentation) to operate and use those products in connection with the Motive cloud platform in an infringing manner with knowledge that these actions would infringe the '130 Patent.  For example, Motive instructs its customers on how to install and use its dash cam products.  *See, e.g.,* https://www.youtube.com/watch?v=3JNG2h3KnU4; https://gomotive.com/dashcam-guide/ (AI Dashcam Installation Guide); https://helpcenter.gomotive.com/hc/en-us/sections/6071854200733-Dashcam-Installation (general Dashcam Installation page); https://helpcenter.gomotive.com/hc/en-us/articles/6163160544541-How-to-install-Motive-Smart-Dashcam (How to install Motive Smart Dashcam); https://helpcenter.gomotive.com/hc/en-us/articles/13633185676189-Getting-Started-with-AI-Omnicam (Getting Started with AI Omnicam); https://helpcenter.gomotive.com/hc/en-us/articles/11580701571997-How-to-install-AI-Omnicam-using-Fleet-App (How to install AI Omnicam using Fleet App).

168.    Motive has contributed to infringement of the '130 Patent by others by selling and/or offering for sale to Motive's purchasers and customers within the United States and/or importing into the United States products, including the Vehicle Gateway, AI Omnicam, AI Dashcam and associated software, that are especially made and/or adapted for infringing the '130 Patent and are not staple articles of commerce suitable for substantial non-infringing uses and that have been sold to purchasers and customers who infringe the '130 Patent.  Given the knowledge of the '130 Patent by Motive as previously alleged, Motive has knowledge that its products, including the AI Dashcam, AI Omnicam, Vehicle Gateway and associated software are

specifically made and/or adapted for infringement of the '130 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

169.    Motive's infringement of the '130 Patent has caused and continues to cause damage and irreparable injury to Samsara, and Samsara will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

170.    Due to Motive's infringement of the '130 Patent, Samsara is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, and 283–284.

171.    Motive continues to infringe the '130 Patent as alleged above, despite having knowledge of the patent, and is acting with willful, intentional, and conscious disregard of the objectively high likelihood that its acts constitute infringement of the '130 Patent.

## COUNT III — INFRINGEMENT OF U.S. PATENT NO. 11,611,621

172.    Samsara repeats and re-alleges each and every allegation in paragraphs 97–100, 103, and 119–126 as if fully set forth herein.

173.    The USPTO duly and legally issued the '621 Patent on March 21, 2023.

174.    Motive has infringed, and continues to infringe, one or more claims of the '621 Patent, including at least claim 8, either literally or under the doctrine of equivalents, by making, using (including by testing and/or demonstrating), selling, offer for sale, and/or importing into the United States products and services, including Motive's safety event detection service, that are covered by one or more claims of the '621 Patent.  Motive's infringement is ongoing.

175.    A person using at least the Motive safety event detection service that identifies driving events practices each limitation of at least claim 8 of the '621 Patent.  *See* Ex. 3.

176.    The preamble of claim 8 of the '621 Patent recites: "[a] method comprising."  To the extent the preamble of claim 8 of the '621 Patent is construed to be limiting, a person using the Motive safety event detection service practices "a method."

177.    Limitation [8][i] of claim 8 of the '621 recites: "accessing a first data stream from the plurality of data streams generated by a first sensor device mounted at the vehicle."  A person using the Motive safety event detection service practices this limitation.  The safety event detection service accesses a video stream from a Motive dashcam (*e.g.*, AI Dashcam or AI Smart Dashcam or AI Omnicam).



*Seat Belt Use*[61]

178.    Limitation [8][ii] of claim 8 of the '621 Patent recites: "detecting a feature within the first data stream generated by the first sensor device mounted at the vehicle, the feature comprising an image feature that corresponds with an event type from among a plurality of event types, the event type comprising a set of conditions that correspond with a procedure that comprises an identification of at least a second sensor device from among a plurality of sensor devices mounted at the vehicle, the procedure associated with a traffic sign represented by the image feature."  A person using the Motive safety event detection service practices this limitation. The safety event detection service detects features in the video data (*e.g.*, shape and/or color of a stop sign) corresponding to, *e.g.*, a failure to stop event.  On information and belief, the Motive

---

[61] https://gomotive.com/products/dashcam/fleet-dash-cam-comparison/#seat-belt-use.

safety event detection service includes algorithms that, *inter alia*, identify safety events (such as a failure to stop) using a set of conditions that correspond with a procedure that identifies additional data from a second sensor device (*e.g.*, a Vehicle Gateway).



*Seat Belt Use*[62]

179.    Limitation [8][iii] of the '621 Patent recites: "selecting the second sensor device based on the procedure that corresponds with the event type, in response to the detecting the feature that corresponds with the event type within the first data stream."   A person using the Motive safety event detection service practices this limitation.  On information and belief, the safety event detection service selects to upload, *e.g.*, speed, accelerometer, or other data from the Gateway onboard a vehicle in response to a detection using video images.

---

[62] *Id.*



*How to View Stop Sign Violation Events on Fleet Dashboard*[63]

Telematics        Captures speed, fuel, fault
                  codes, barometric pressure,
                  battery voltage, coolant temp,
                  engine intake temp, engine load,
                  and more to the Motive platform



Ex. 10 at 2.

180.    Limitation 8[iv] of claim 8 of the '621 Patent recites: "accessing a second data stream generated by the second sensor device, the second data stream comprising a set of attributes."  A person using the Motive safety event detection service practices limitation.  On information and belief, the safety event detection service uploads data (*e.g.*, speed, accelerometer, or other data) from the Gateway onboard a vehicle in response to a detection using video images.

---

[63] https://helpcenter.gomotive.com/hc/en-us/articles/6163732277917-How-to-view-Stop-Sign-Violation-events-on-Fleet-Dashboard.

181.    Limitation [8][v] of claim 8 of the '621 Patent recites: "identifying a client device based on the detecting the feature that corresponds with the event."  A person using the Motive safety event detection service practices this limitation.  On information and belief, the safety event detection service identifies a client device, *e.g.*, the device running the Motive Fleet Dashboard software and/or the client device with the driver of the vehicle that caused the safety event (*e.g.*, via "in-cab" alerts received on the Motive dashcams.[64]).



*How to View Stop Sign Violation Events on Fleet Dashboard*[65]

182.    Limitation [8][vi] of claim 8 of the '621 Patent recites: "presenting a notification that includes an event indicator at the client device based on the set of attributes from the second data stream."  A person using the Motive safety event detection service practices this limitation.  On information and belief, the safety event detection service presents a notification of the safety event on the client device, *e.g.*, the device running the Motive Fleet Dashboard software and/or

---

[64] https://helpcenter.gomotive.com/hc/en-us/articles/11761978874141-How-to-enable-Dashcam-In-cab-Alerts-for-a-Vehicle-.
[65] https://helpcenter.gomotive.com/hc/en-us/articles/6163732277917-How-to-view-Stop-Sign-Violation-events-on-Fleet-Dashboard.

the client device with the driver of the vehicle that caused the safety event (*e.g.*, via "in-cab" alerts.[66]).



*How to View Stop Sign Violation Events on Fleet Dashboard*[67]

183.    Motive directly infringes claim 8 of the '621 Patent by performing the claimed method (*e.g.*, during testing and/or demonstration of the Motive safety event detection service).

184.    In addition to directly infringing the '621 Patent, Motive indirectly infringes one or more claims of the '621 Patent, including at least claim 8, by actively inducing others (including its customers) to directly infringe the '621 Patent in violation of 35 U.S.C. § 271(b).  Specifically, in light of Motive's knowledge of the '621 Patent, Motive has induced infringement of the patent with specific intent to do so, by its activities relating to the marketing, distribution, and/or sale of its products to purchasers and customers, including the Motive safety event detection service, and by instructing and encouraging purchasers and customers (including via product documentation)

---

[66] https://helpcenter.gomotive.com/hc/en-us/articles/11761978874141-How-to-enable-Dashcam-In-cab-Alerts-for-a-Vehicle-.
[67] https://helpcenter.gomotive.com/hc/en-us/articles/6163732277917-How-to-view-Stop-Sign-Violation-events-on-Fleet-Dashboard.

to operate the software along with other Motive products (dashcams and Vehicle Gateway) in an infringing manner with knowledge that these actions would infringe the '621 Patent.

185.    For example, Motive advertises that its safety event detection service monitors and detects a number of safety events, including stop sign violations (*see, e.g.*, What Unsafe Behaviors Does Motive Monitor Through Dashcam and Vehicle Gateway?[68]).  Further, Motive instructs its customers on how to view "Stop Sign Violation events" on the Fleet Dashboard (*see, e.g.*, How to View Stop Sign Violation Events on Fleet Dashboard[69]).  Motive also provides instructions to its customers on how to use safety risk tags with its safety event detection service (*see, e.g.*, What Are Safety Risk Tags?[70]).

186.    Motive has contributed to infringement of the '621 Patent by others by selling and/or offering for sale to Motive's purchasers and customers within the United States and/or importing into the United States products and services, including the Motive AI Dashcam, AI Omnicam, AI Smartcam, Vehicle Gateway, and the safety event detection service.  These products are especially made and/or adapted for infringing the '621 Patent and are not staple articles of commerce suitable for substantial non-infringing uses and that have been sold to purchasers and customers who infringe the '621 Patent.  Given the knowledge of the '621 Patent by Motive as previously alleged, Motive has knowledge that its products and services, including the safety event detection service, are specifically made and/or adapted for infringement of the '621 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

---

[68] https://helpcenter.gomotive.com/hc/en-us/articles/6858636962333-What-unsafe-behaviors-does-Motive-monitor-through-Dashcam-and-Vehicle-Gateway-#01HCB72T2EXXW3FFVJ1XSDEG77.
[69] https://helpcenter.gomotive.com/hc/en-us/articles/6163732277917-How-to-view-Stop-Sign-Violation-events-on-Fleet-Dashboard.
[70] https://helpcenter.gomotive.com/hc/en-us/articles/6163713841053.

187.    Motive's infringement of the '621 Patent has caused and continues to cause damage and irreparable injury to Samsara, and Samsara will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

188.    Due to Motive's infringement of the '621 Patent, Samsara is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, and 283–284.

189.    Motive continues to infringe the '621 Patent as alleged above, despite having knowledge of the patent, and is acting with willful, intentional, and conscious disregard of the objectively high likelihood that its acts constitute infringement of the '621 Patent.

## COUNT IV — FALSE ADVERTISING

190.    Samsara repeats and re-alleges each and every allegation in paragraphs 68–91 and 101  as if fully set forth herein.

191.    Motive's commercial advertising claims described herein are false and misleading in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

192.    Motive has made material false and misleading statements about Motive and Samsara's AI video-based safety applications in Motive's commercial advertisements for its AI dash cam, and these statements have and are likely to continue to influence consumers' purchasing decisions.

193.    Motive's statements—including its various literally false claims—have deceived or have the tendency to deceive a substantial segment of consumers, who have relied or likely will rely on Motive's false statements in making their AI video-based safety application purchasing decisions.

194.    Motive has caused its false statements to enter interstate trade or commerce.

195.    As a direct and proximate result of Motive's false and deceptive campaign, Samsara is suffering immediate and continuing irreparable injury for which there is no adequate remedy at law.

196.    As a direct and proximate result of these actions, Samsara has suffered and/or is likely to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Samsara to Motive and by a loss of goodwill associated with Samsara's AI video-based safety application and brand.

197.    Motive's false advertising is knowing and willful.  Samsara is entitled to injunctive relief and to the recovery of all available damages, attorneys' fees, costs, and Motive's profits.

198.    This is an exceptional case within the meaning of Section 35 of the Lanham Act, 15 U.S.C. § 1117.

## COUNT V — FRAUD

199.    Samsara repeats and re-alleges each and every allegation in paragraphs 47–67 and 102 as if fully set forth herein.

200.    On information and belief, since at least 2017, Motive senior-level employees and other personnel have misrepresented their identities and corporate affiliations, as set forth in paragraphs 52–58 and 66, with the intent to defraud Samsara into believing that they were affiliated with actual or potential customers of Samsara.

201.    On information and belief, between at least 2019 and 2022, Motive personnel also used these fictitious identities and corporations to solicit information about Samsara's proprietary technology and business plan from its customer service representatives, as set forth in paragraph 54.

202.    On information and belief, at all relevant times, Motive's personnel knew their representations regarding their true identities and corporate affiliations were false, and/or they

intentionally concealed their true identities and affiliation with Motive, which they had a duty to disclose.

203.    On information and belief, Motive personnel made these misrepresentations and/or concealed these facts under the direction of Motive and/or within the scope of their employment with Motive and to induce Samsara to grant them access to Samsara's platform and technology and divulge non-public, competitive information about Samsara's products and business. Indeed, Motive knows that Samsara did not and would not agree to allow Motive to access Samsara's platform and technology for these purposes.

204.    Samsara was unaware of the true identities and corporate affiliation of Motive personnel at the time these material misrepresentations and/or concealments were made.

205.    In reliance on Motive's misrepresentations and/or concealment, Samsara granted Motive access to Samsara's platform, shipped Motive Samsara devices, and shared with Motive non-public information regarding its technology and business offerings. Had Samsara known of the true identities or corporate affiliation of these Motive personnel, however, Samsara would not have done so.

206.    Samsara's reliance was justified.

207.    As a result of Samsara's reliance on Motive's misrepresentations, Samsara was harmed by, among other things, the loss of competitive information, as well as the expenditure of substantial time and resources of employees who conducted internal investigations regarding the existence of fictitious accounts, the Motive personnel associated with those accounts, and Motive's continued unauthorized access of these accounts, ultimately requiring Samsara to affirmatively deactivate the accounts to terminate access.

208.    Samsara is entitled to compensatory damages arising from Motive's fraudulent conduct pursuant to Cal. Civ. Code § 1709 et seq. and common law.

## **COUNT VI – COMPUTER FRAUD AND ABUSE UNDER 18 U.S.C. § 1030**

209.    Samsara repeats and re-alleges each and every allegation in paragraphs 47–67 and 102 as if fully set forth herein.

210.    On information and belief, by creating and using fictitious accounts to access Samsara's platform, Motive, through its agents and employees, knowingly and with intent to defraud, accessed a protected computer without authorization and/or in excess of authorization. On information and belief, Motive directly induced and/or encouraged its employees to do so.

211.    Samsara's web-based software platform is a computer used in or affecting interstate commerce.

212.    On information and belief, Motive created and used these fictitious accounts to further its scheme to copy Samsara's technology and business, as well as commission fraudulent benchmarking studies, which it used and continues to use to deceive consumers into believing that Motive's dash cam performs more accurately and quickly than Samsara's AI video-based safety solution.  On information and belief, Motive had no other purpose to access Samsara's platform.

213.    By means of Motive's conduct, Motive furthered its intended fraud and obtained valuable information in excess of $5,000, including but not limited to non-public information concerning Samsara's proprietary technology and its capabilities.

214.    As a direct and proximate result of Motive's conduct, Samsara has suffered a loss in excess of $5,000, including from the expenditure of substantial time and resources of employees who conducted internal investigations regarding the existence of fictitious accounts, the Motive personnel associated with those accounts, and Motive's continued unauthorized access of these

accounts, ultimately requiring Samsara to affirmatively deactivate the accounts to terminate access.

215.    As a direct and proximate result of Motive's conduct, Samsara has also suffered and continues to suffer harm, and is entitled to compensatory damages and injunctive relief.

## COUNT VII — UNFAIR COMPETITION – FRAUD UNDER CAL. BUS. & PROF. CODE §§ 17200 et seq.

216.    Samsara repeats and re-alleges each and every allegation in paragraphs 47–67, 200–208, and 210–215 as if fully set forth herein.

217.    As set forth herein, Motive has engaged in unlawful business practices, including but not limited to fraud and unauthorized access of Samsara's platform in violation of the Computer Fraud and Abuse Act.

218.    Motive's conduct has caused and will continue to cause injury and harm to Samsara, including because Samsara has lost substantial time and resources through employees who conducted internal investigations regarding Motive's fraudulent business practices.

219.    As a direct and proximate result of these actions, Samsara has suffered significant monetary damages.

220.    Samsara is entitled to injunctive relief and civil penalties, in an amount to be determined at trial.

## COUNT VIII — UNFAIR COMPETITION – FALSE ADVERTISING UNDER CAL. BUS. & PROF. CODE §§ 17200 et seq.

221.    Samsara repeats and re-alleges each and every allegation in paragraphs 68–91 and 101 as if fully set forth herein.

222.    As set forth herein, Motive has engaged in unlawful business practices, including but not limited to making deceptive, false, and misleading statements concerning Samsara's AI video-based safety application in its commercial advertising.

223.    Motive's conduct has caused and will continue to cause injury and harm to Samsara, including by the direct diversion of sales from Samsara to Motive and by a loss of goodwill associated with Samsara's AI video-based safety application and brand.

224.    As a direct and proximate result of these actions, Samsara has suffered significant monetary damages.

225.    Samsara is entitled to injunctive relief and civil penalties, in an amount to be determined at trial.

## COUNT IX — UNFAIR COMPETITION UNDER DELAWARE DECEPTIVE TRADE PRACTICES ACT, 6 DEL. CODE §§ 2351 et seq.

226.    Samsara repeats and re-alleges each and every allegation in paragraphs 68–91 and 101 as if fully set forth herein.

227.    As set forth herein, Motive has engaged in deceptive trade practices, including but not limited to making false or misleading statements in Motive's commercial advertisements about the characteristics, uses, benefits, standard, and quality of Motive and Samsara's AI video-based safety applications.

228.    As further set forth herein, Motive has made false or misleading statements in its commercial advertisements that disparage Samsara's products, including but not limited to its AI video-based safety applications.

229.    Motive's conduct creates a likelihood of confusion or of misunderstanding.

230.    Motive's deceptive trade practices, including but not limited to its false and misleading statements, have and are likely to continue to influence consumers' purchasing decisions.

231.    As a direct and proximate result of Motive's deceptive trade practices, Samsara is suffering immediate and continuing irreparable injury for which there is no adequate remedy at law.

232.    As a direct and proximate result of Motive's actions, Samsara has suffered and/or is likely to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Samsara to Motive and by a loss of goodwill associated with Samsara's AI video-based safety application and brand.

233.    Motive's deceptive trade practices are knowing and willful, with malicious and deceptive intent, making this an exceptional case.  Samsara is entitled to injunctive relief and to the recovery of all available damages, attorneys' fees, costs, and Motive's profits.

### DEMAND FOR JURY TRIAL

234.    Samsara hereby demands a jury trial for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Samsara respectfully requests that this Court enter judgment in its favor as follows:

A.    Judgment be entered that Defendants have infringed one or more claims of each of the Samsara Patents, literally and under the doctrine of equivalents.

B.    Pursuant to 35 U.S.C. § 283, Defendant and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, be permanently enjoined from: (1) infringing the Samsara Patents; (2) making, using, selling, and offering for sale, or importing into the United States, the Motive Accused Products; and (3) making any false or misleading advertisements about Samsara's products.

**C.**    Pursuant to 18 U.S.C. § 1030, Defendant and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assignees and all those acting on behalf of or in active concert or participation with any of them, be permanently enjoined from accessing Samsara's software, which includes, but is not limited to, Samsara's web-based software platform;

**D.**    Pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Defendant and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, be permanently enjoined from engaging in the unlawful practices described in this complaint, including using false information to create accounts on Samsara's web-based software platform, and directly or indirectly using in commerce or causing to be published or otherwise disseminated any promotional materials or advertising materials containing any of the false claims described in the complaint;

**E.**    Pursuant to the Delaware Deceptive Trade Practices Act, 6 Del. Code §§ 2351 *et seq.*, Defendant and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, be permanently enjoined from engaging in the unlawful practices described in this complaint, including directly or indirectly using in commerce or causing to be published or otherwise disseminated any promotional materials or advertising materials containing any of the false claims described in the complaint;

**F.**    Samsara be awarded damages sufficient to compensate Samsara for Motive's infringement of the Samsara Patents under 35 U.S.C. § 284;

**G.**    Samsara be awarded actual and compensatory damages and disgorgement of profits for Motive's false advertising under 15 U.S.C. § 1125(a);

**H.**    Samsara be awarded compensatory damages for Motive's fraud and violation of 18 U.S.C. § 1030(a)(4);

**I.**    Samsara be awarded punitive damages for Motive's fraud;

**J.**    Samsara be awarded civil penalties under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

**K.**    Samsara be awarded actual and compensatory damages, including treble damages, under 6 Del. Code §§ 2351 *et seq.*;

**L.**    The case be found exceptional under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117 and that Samsara be awarded its reasonable attorneys' fees;

**M.**    Samsara be awarded its costs and expenses in this action;

**N.**    Samsara be awarded prejudgment and post-judgment interest; and

**O.**    Samsara be awarded further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Emily S. DiBenedetto

OF COUNSEL:
Ellisen S. Turner
Ali-Reza Boloori
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(310) 552-4200

Joseph A. Loy
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, NY 10022
(212) 446-4980

Jeanne M. Heffernan
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Dated: March 20, 2024

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
edibenedetto@shawkeller.com
lgellar@shawkeller.com
Attorneys for Plaintiff Samsara Inc.